Argued and submitted January 22, 2009, general judgment reversed on appeal and on cross-appeal and remanded; supplemental judgment for costs and attorney fees vacated and remanded March 24, petition for review denied July 8, 2010 (348 Or 524)

THUNDERBIRD MOBILE CLUB, LLC,
*Plaintiff-Respondent*
*Cross-Appellant,*

*v.*

CITY OF WILSONVILLE,
*Defendant-Appellant*
*Cross-Respondent.*

Clackamas County Circuit Court
CV05110027; A134750

228 P3d 650

Paul A. Lee argued the cause for appellant - cross-respondent. With him on the briefs were Michael E. Kohlhoff and City of Wilsonville.

William Dickas argued the cause for respondent - cross-appellant. With him on the briefs was Kell, Alterman & Runstein, LLP.

Thomas Sponsler, Nancy L. Werner, and Beery, Elsner & Hammond, LLP filed the brief *amicus curiae* for League of Oregon Cities.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Sercombe, Judge.*

SERCOMBE, J.

---

* Brewer, C. J., *vice* Edmonds, P. J.

**SERCOMBE, J.**

Plaintiff, the owner of a mobile home park, filed a declaratory judgment action against the City of Wilsonville (city) to invalidate the city's ordinances that regulate the conversion of mobile home parks to other uses. Following a trial, the trial court entered a judgment declaring that those ordinances are preempted by state law and violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The city appeals and contends that the controversy is not justiciable, the ordinances are not preempted, and the ordinances are not invalid as a matter of substantive due process. The city also asserts that the trial court erred in awarding attorney fees under 42 USC section 1988.

Plaintiff disputes the city's contentions and cross-appeals, assigning as error the trial court's failure to invalidate the ordinances for additional reasons. Plaintiff asserts that the trial court should have found that the operation of the ordinances effects an uncompensated taking of plaintiff's property and money, that the operation of the ordinances unconstitutionally impairs the obligations of lease agreements between defendant and its tenants, and that the operation of the law to affect only mobile home parks within the city boundaries violates uniformity policies in the state and federal constitutions.

We conclude that the issues raised in the city's appeal are justiciable and that the ordinances are not preempted under state law or facially unconstitutional under the Due Process Clause. We also conclude that the trial court erred in failing to determine whether the ordinances are invalid on their face for the alternative reasons plaintiff advances in its cross-appeal, and we remand for a determination on the justiciability and merits of those claims. In light of those conclusions, the trial court erred in awarding attorney fees to plaintiff. Accordingly, we reverse and remand the general judgment under review and vacate and remand the supplemental judgment for costs and attorney fees.

## I.  PROCEDURAL HISTORY

This case concerns the legality of the city's ordinances that regulate the closure of mobile home parks by requiring the park owner to obtain a closure permit from the city and to compensate displaced tenants. At the time of the adoption of the ordinances,[1] ORS 90.630(5) (2005) directed a mobile home park landlord who wished to convert the park to a different use to provide tenants with a one-year notice of termination, or at least 180 days' notice of termination, together with "space acceptable to the tenant to which the tenant can move" and payment of moving expenses, or $3,500, whichever is less.[2] Then and now, ORS 90.505 to 90.840 regulated a number of aspects of the landlord-tenant relationship for the rental of spaces in mobile home parks, including policies concerning disclosures to tenants, billing methods for utility charges, extensions of the term of a rental agreement, rental increases, termination of tenancies, closure of the facility, ownership changes, and sale of the mobile home. All of those policies were part of the Oregon Residential Landlord and Tenant Act, ORS chapter 90. ORS 90.115 sets out the scope of that act:

> "This chapter applies to, regulates and determines rights, obligations and remedies under a rental agreement, wherever made, for a dwelling unit located within this state."

---

[1] State statutes regulating the conversion of mobile home parks were changed in 2007 and 2009. Or Laws 2007, ch 906; Or Laws 2009, ch 575. The nature of those changes and their effect on the issues in this appeal are discussed later in this opinion.

[2] ORS 90.630(5) (2005), *amended by* Or Laws 2007, ch 906, provided:

"The landlord of a facility may terminate a rental agreement that is a month-to-month or fixed term tenancy for a facility space if the facility or a portion of it that includes the space is to be closed and the land or leasehold converted to a different use, which is not required by the exercise of eminent domain or by order of state or local agencies, by:

"(a)  Not less than 365 days' notice in writing before the date designated in the notice for termination; or

"(b)  Not less than 180 days' notice in writing before the date designated in the notice for termination, if the landlord finds space acceptable to the tenant to which the tenant can move the manufactured dwelling or floating home and the landlord pays the cost of moving and set-up expenses or $3,500, whichever is less."

In the summer of 2005, plaintiff notified affected tenants that it intended to sell the Thunderbird Mobile Club, a 270-space mobile home park. The park had been in operation for 40 years and was inhabited mostly by persons on fixed incomes. A hue and cry ensued that led to hearings before the city council on the potential expulsion of tenants and conversion of the park to other uses. The council determined that mobile home parks provided affordable housing for low and moderate income persons and that closure of a park typically forces the park residents to abandon their dwellings without recovery of the dwelling's value. After public hearings, the council adopted Ordinance Nos. 600 and 603. The ordinances required:

- A mobile home closure permit prior to closing a mobile home park. "Closure of a mobile home park" was defined to include the termination of "mobile home space rental agreements for all or a portion of the park spaces or [the engagement] in activity to effect termination of rental agreements or leases or to evict tenants." The ordinances provided that the requirement for a permit was not intended to affect any right to obtain a land use decision for the park use, to "sell, convey or transfer a mobile home park" or to "provide notification under ORS 90.630(5)."

- The filing of a closure impact report as part of an application for a closure permit. That report was required to detail the particulars of the current rental of spaces in the park, provide a list of comparable rentals within 100 miles of the city, set out an analysis of the economic effects of tenant relocation, and offer relocation specialist services to tenants.

- A relocation plan as part of the closure permit application. Under a plan, the owner was required to provide for payment of all reasonable relocation costs for tenants to locate to a comparable space within 100 miles of the city, and, if the dwelling could not be relocated, to purchase the dwelling at its assessed value.

- That the ordinances "be construed as not to conflict with state law, and shall be applied in a manner such that the provisions and state law operate concurrently."

- An "owner relief" process, allowing the park owner to apply for relief from the requirements of the ordinances if the "application of the ordinance[s are] unduly oppressive under the circumstances then and there existing[.]" In allowing or denying an application for relief, the council was required to consider "the amount and percentage of value loss, the extent of remaining uses, past, present and future, the seriousness of the public problem caused by the owner's acts of closure, the degree to which these provisions mitigate the problem[,] * * * the feasibility of less oppressive solutions[,] * * * [and] other factors as may be relevant or necessary to achieve a lawful application of these provisions." The ordinances mandated the adoption of findings on the relief application after a public hearing and provided for judicial review of the decision.

After adoption of the ordinances, but before it applied for any permit or owner's relief under the ordinances, plaintiff filed its first amended complaint, seeking declaratory and injunctive relief. It sought declarations that the ordinances were preempted by the Oregon Residential Landlord and Tenant Act and otherwise effected uncompensated takings of real property and money under the state and federal constitutions; uncompensated taking of services under Article I, section 18, of the Oregon Constitution; deprivation of property without due process of law in violation of the Fourteenth Amendment to the United States Constitution; deprivation of property without remedy in violation of Article I, section 10, of the Oregon Constitution; impairment of tenant contracts inconsistent with Article I, section 10, of the United States Constitution and Article I, section 21, of the Oregon Constitution; denial of equal protection under the Fourteenth Amendment to the United States Constitution; denial of equal privileges in violation of Article I, section 20, of the Oregon Constitution; and improper exercise of judicial functions by a governmental body that was not a court. Plaintiff also alleged:

"The adoption and threatened enforcement of the Ordinance[s] by the City of Wilsonville acting under color of law and ordinance, deprives the Plaintiff of its rights, privileges and immunities secured by the Constitution of the United States in violation of Section 1983, Title 42, United

States Code. Plaintiff is entitled to its costs and reasonable attorney fees incurred herein by reason of Section 1988 of Title 42, United States Code, and by reason of ORS 20.085."

The prayer sought a "declaration that the Ordinance[s are] unlawful," an injunction against their enforcement, and reasonable costs and attorney fees.

Following a trial, the trial court entered the judgment under review. The judgment contained specific findings that plaintiff's costs to comply with the ordinances, if a conversion permit were sought, would be substantial. The court found that there were 765 mobile home parks within 100 miles of Wilsonville, with over 38,000 mobile home spaces, so that the costs of preparation of an impact report assessing those spaces would be "substantial." The court further determined that the costs of relocating a mobile home ranges from $3,000 to $27,000, depending on whether the home is a "single wide" or "double wide" mobile home and that approximately two-thirds of the 184 tenant-owned mobile homes in plaintiff's park were larger, double-wide homes. According to the trial court's findings, if the mobile homes could not be relocated, the costs to purchase the homes under the ordinance would be $2,485,570, and the costs of dismantling and disposing of the purchased mobile homes would exceed $3,000 for each dwelling. The court concluded:

"Assuming Thunderbird closed the park with the current tenant population and received no relief from Ordinance requirements under Sections 6.380 or 6.340(1)(c) the reasonable relocation costs of all of the homes in Thunderbird will range from $3,494,000 to $4,968,000. If all of the tenants were able to have or use the full State tax credit, the reasonable relocation costs imposed by Ordinance No. 600 as a condition of obtaining a closure permit will range from $1,656,000 to $3,128,000. It is probable that not all of the tenants of Thunderbird will be able to have or use the Oregon tax credit."

The trial court found that plaintiff had listed the property for sale and provided notice of that listing to the tenants as required by state law. Plaintiff had not, however,

taken steps to convert the park by giving notice of termination under ORS 90.630(5) or sought to avoid the requirements of the city's ordinances under the "owner relief" provisions. The court nonetheless concluded that there was an "actual, present conflict between the parties," that determination of plaintiff's claims "will have a practical effect upon the parties," that the "issues are not academic or speculative," and that plaintiff "cannot sell its property, or close the park without either complying with Ordinance No. 600, as amended, or violating its provisions."

On the basis of those and other adopted findings, the trial court concluded that the ordinances were preempted by state law and that "Ordinance No. 600, as amended by Ordinance No. 603, conflicts with ORS 90.630. It prohibits what State law permits." The court also granted plaintiff relief on the substantive due process claim, finding that the "conditions of the Ordinances are unduly oppressive, and in violation of the due process clause of the Fourteenth Amendment to the U.S. Constitution." With respect to the other claims, the trial court determined that "[i]t is not necessary to decide those claims in order to grant complete relief to Plaintiff, and all claims of Plaintiff not hereinbefore sustained are dismissed." The trial court declared that the ordinances "are *ultra vires*, preempted, and displaced by the law of Oregon, and are therefore, void, and of no effect" and enjoined the city from taking "action to enforce the provisions, requirements or penalties of the Ordinances against the Plaintiff."

On appeal, the city contends that the court erred in concluding that the declaratory judgment action was justiciable, in determining that the ordinances were preempted by state law, in deciding that the ordinances violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution, in granting injunctive relief, and in awarding attorney fees and costs to plaintiff and denying costs to the city. Plaintiff cross-appeals and contends that the court erred in declining to award plaintiff the full amount of its attorney fees and that the court improperly dismissed its takings, impairment of contract, and uniformity claims under the state and federal constitutions.

## II.  JUSTICIABILITY

In its first assignment of error, the city argues that the trial court erred in determining that any of plaintiff's claims presented a justiciable controversy that was ripe for adjudication. As noted, the trial court found that: (1) "[d]etermination of the claims of [plaintiff] will have a practical effect upon the parties"; (2) "[plaintiff] cannot sell its property, or close the park without either complying with Ordinance No. 600, as amended, or violating its provisions"; and (3) "[t]his matter is justiciable, and ripe for adjudication." The city contends that those determinations are factually and legally unsound because: (1) the ordinances have yet to be applied to plaintiff; plaintiff has not provided notice of termination of the park, sought to avoid ordinance requirements, or pursued owner relief under the ordinance's provisions; and (2) plaintiff has not entered into a sale contract conditioned on compliance with the ordinance. Thus, the city argues that the controversy about the effects of the ordinances depends on contingent or hypothetical events. Plaintiff responds that the enactment of the ordinances has impaired the marketability of its property.

The facts are undisputed, and we review for legal error. *See Ken Leahy Construction, Inc. v. Cascade General, Inc.*, 329 Or 566, 571, 994 P2d 112 (1999). Because plaintiff's preemption and due process claims sought declaratory relief, we turn to the declaratory judgment statutes to determine whether relief can be allowed under the terms of those statutes. *See US West Communications v. City of Eugene*, 336 Or 181, 191, 81 P3d 702 (2003). ORS 28.020 provides:

> "Any person * * * whose rights, status or other legal relations *are affected* by a constitution, statute, municipal charter, ordinance, contract or franchise may have determined any question of construction or validity arising under any such * * * constitution, statute, municipal charter, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."

(Emphasis added.)

■ ■ " 'Standing under [Oregon's declaratory judgment statutes] has been denied when the showing of the required effect has been too speculative or entirely missing.' "

*Vannatta v. Oregon Government Ethics Comm.*, 347 Or 449, 470, 222 P3d 1077 (2009) (quoting *Gruber v. Lincoln Hospital District*, 285 Or 3, 7, 588 P2d 1281 (1979)). Thus, in identifying how its rights, status, or other legal relations are affected, a plaintiff "must show some injury or other impact * * * beyond an abstract interest in the correct application or the validity of a law." *League of Oregon Cities v. State of Oregon*, 334 Or 645, 658, 56 P3d 892 (2002). In addition, the Supreme Court has held that the use of the present tense phrase "are affected" in ORS 28.020 implies that the controversy, to be justiciable, must involve "a dispute based on present facts rather than on contingent or hypothetical events." *US West Communications*, 336 Or at 191. That aspect of justiciability, ripeness, is also a "constitutional prerequisite for adjudication, the declaratory judgment statutes to the contrary notwithstanding." *Menasha Forest Products Corp. v. Curry County Title*, 234 Or App 115, 120, 227 P3d 770 (2010).

To determine whether plaintiff satisfied the statutory requirements in ORS 28.020, and whether the claims are ripe for adjudication, we examine the underlying facts to determine if and how the challenged ordinance restrictions affect plaintiff's legal interests. As found by the trial court, the facts are as follows. Plaintiff listed its mobile home park property for sale and gave notice of that listing to its tenants. As a direct result of that listing, plaintiff's tenants urged the city to adopt tenant protection legislation, and, following a public hearing, the city council adopted Ordinance Nos. 600 and 603. Plaintiff has since found potential purchasers interested in redeveloping the park, but has not found a potential purchaser interested in purchasing the property and continuing to operate it as a mobile home park. Moreover, all of the interested potential purchasers plaintiff has found would require plaintiff to close the park and remove the mobile homes as a condition of closing a purchase.

Those facts bring to mind a hypothetical we posed in *Beck v. City of Portland*, 202 Or App 360, 122 P3d 131 (2005). In that case, the plaintiffs, property owners along Gibbs

Street in Portland, sought declaratory relief from an ordinance and resolution that pertained to the possible development of an aerial tram over their street. *Id.* at 362. The plaintiffs argued that their status as property owners along Gibbs Street established a justiciable controversy under ORS 28.020. *Id.* at 371. We ultimately found that the plaintiffs' claim for declaratory relief was not ripe:

> "[The plaintiffs'] status as property owners was not affected by [the ordinance or resolution] because those enactments made clear that the construction of an aerial tram above Gibbs Street, although more than a fleeting idea in the mind of a city planner, remained only a possibility. * * * [P]laintiffs neither alleged nor presented facts that would establish that merely considering Gibbs Street as the alignment for a potential tram affected any of their rights, statuses, or other legal relations. *For example, none of the plaintiffs alleged that potential buyers of their property had been deterred from purchasing Gibbs Street property because of defendant's enactments.* Whether even that would have been sufficient to establish the existence of a justiciable controversy under ORS 28.020 for the declaration that plaintiffs sought, we reserve for another day. We simply use that hypothetical to illustrate that the point at which a claim becomes ripe depends on the relationship among the defendant's enactments, the rights, status, or other legal relations of the plaintiff that are at issue, and the nature of the declaratory relief that is sought."

*Id.* (emphasis added).

■        Here, although the ordinance, as amended, provides that it is not intended to limit a person's ability to sell, convey, or transfer a mobile home park, *see* Ordinance No. 603, section 2, this case is nonetheless about plaintiff's ability to sell its mobile home park property. The fact that plaintiff cannot sell its property to any of the potential purchasers without first closing the park and removing the mobile homes gives rise to the inference that the ordinance has deterred the potential purchasers from buying the property as is. Put another way, the ordinance presently affects the marketability and value of plaintiff's property. Plaintiff's requested relief for a declaration that the ordinance is unlawful would,

if granted, appear to have an immediate effect on plaintiff's legal interests.

It is true, as the city points out, that plaintiff has not sought to close the park, avoid the ordinance requirements, or gain relief under the ordinance's provisions. Nor has plaintiff entered into a sale contract conditioned on compliance with the ordinance. But none of those are steps that plaintiff is required to take to pursue his challenges to the lawfulness of the ordinance on preemption or substantive due process grounds, so long as the facts otherwise indicate that the mere enactment of the ordinance has affected plaintiff's legal interests. Because the facts in this case demonstrate that plaintiff has already reached the point at which his legal interests "are affected" by the ordinance, we conclude that the trial court did not err in holding plaintiff's preemption claim to be justiciable and that jurisdiction exists to determine both the preemption and due process clause claims on appeal.[3]

---

[3] We also conclude that the preemption and due process claims have not been mooted by legislation enacted after adoption of the ordinances. The 2007 Legislative Assembly changed the statutes on mobile home park conversions to require more generous tenant benefits. Those increased benefits, however, would be less costly to an owner than the full payment of moving expenses or the forced purchase of the manufactured dwelling required by the ordinances as a precondition to conversion. *See* Or Laws 2007, ch 906, § 2. The 2007 law, as amended in 2009, directly regulates the authority of local governments to enforce local regulations of mobile home park conversions "adopted by the local government on or after July 1, 2007, or amended on or after January 1, 2010." ORS 90.660. The 2007 law, as originally enacted, allowed amendments to local laws on mobile home park closures until September 27, 2007, if the law was adopted before July 1, 2007, and the amendment increased the rights of tenants under the local law. Or Laws 2007, ch 906, § 5(1).

The 2007 legislative changes neither expressly preempt nor affirmatively ratify the ordinances under review, because none of the changes is directly applicable to those ordinances. The ordinances were adopted in 2005 and 2006, respectively, and have not been amended since; however, we note that, in June 2007, in Ordinance No. 634, the city reenacted substantially similar provisions to Ordinance Nos. 600 and 603. Ordinance No. 634 is not under review.

Moreover, the 2007 law did not amend ORS 90.115, the basis of plaintiff's claimed express preemption of the ordinances, or change the dynamic of plaintiff's implied preemption analysis—that the city was disabled from providing greater tenant displacement benefits than required by state law. This appeal differs from cases where the constitutionality of a statute is adjudicated by a trial court and the statute is amended or repealed during an appeal. In those cases, "[a]s a general—if not universal—rule, the amendment or repeal of a statute moots pending cases in which the controversy turns on the constitutionality of the unamended or existing statute." *Miller Brands, Inc. v. OLCC*, 90 Or App 266, 268, 752 P2d 320 (1988). Here, the city's ordinances have not been amended or repealed, and the relevant

## III. PREEMPTION AND MUNICIPAL AUTHORITY ISSUES

The city contends that the trial court erred in concluding that the mobile home park conversion ordinances were preempted by portions of the Residential Landlord Tenant Act. It argues that no preemption occurred because the state law does not expressly preempt local legislation and because the local law can operate concurrently with state law. Plaintiff asserts, however, that the municipal ordinances cannot prohibit what state law expressly permits—the conversion of mobile home parks on the payment of certain benefits and without obtaining a local permit. Plaintiff alternatively claims that the city's exercise of this kind of legislative authority is beyond its home rule powers under the state constitution. We conclude that the adoption of the ordinances was within the city's authority under Article XI, section 2, of the Oregon Constitution and that the ordinances are not preempted by state statutes.

The city's power to adopt the ordinances and any preemptive effect of state law on those ordinances are regulated by provisions of the Oregon Constitution that provide "home rule" for cities and towns that adopt municipal charters. Those provisions were adopted in 1906 by an initiative amendment to the constitution. Article XI, section 2, provides, in part:

"The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon * * *."

A companion amendment amended Article IV, section 1, of the Oregon Constitution that "reserved" the initiative and referendum powers of voters for state laws to "further reserve[ ] to the qualified voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district." Or Const, Art IV, § 1(5).

---

state statutes have not been changed in ways that affect the preemption analysis. We conclude that the preemption issues are not mooted by subsequent changes in state law.

■     The primary purpose of the home rule amendments was "to allow the people of the locality to decide upon the organization of their government and the scope of its powers under its charter without having to obtain statutory authorization from the legislature, as was the case before the amendments." *LaGrande/Astoria v. PERB*, 281 Or 137, 142, 576 P2d 1204, *aff'd on reh'g*, 284 Or 173, 586 P2d 765 (1978). The home rule amendments also carve out some limited autonomy for municipal ordinances from overriding state law, but otherwise do not limit the primacy of state legislation over inconsistent municipal enactments. As the Supreme Court explained in *LaGrande/Astoria*:

> "Outside the context of laws prescribing the modes of local government, both municipalities and the state legislature in many cases have enacted laws in pursuit of substantive objectives, each well within its respective authority, that were arguably inconsistent with one another. In such cases, the first inquiry must be whether the local rule in truth is incompatible with the legislative policy, either because both cannot operate concurrently or because the legislature meant its law to be exclusive. It is reasonable to interpret local enactments, if possible, to be intended to function consistently with state laws, and equally reasonable to assume that the legislature does not mean to displace local civil or administrative regulation of local conditions by statewide law unless that intention is apparent."

*Id*. at 148-49 (footnote omitted). *LaGrande/Astoria* sets out principles for resolving conflicts between a state statute and a municipal law:

> "When a statute is addressed to a concern of the state with the structure and procedures of local agencies, the statute impinges on the powers reserved by the amendments to the citizens of local communities. Such a state concern must be justified by a need to safeguard the interests of persons or entities affected by the procedures of local government.
>
> "Conversely, a general law addressed primarily to substantive social, economic, or other regulatory objectives of the state prevails over contrary policies preferred by some local governments if it is clearly intended to do so, unless the law is shown to be irreconcilable with the local community's freedom to choose its own political form. In that case,

such a state law must yield in those particulars necessary to preserve that freedom of local organization."

*Id.* at 156 (footnote omitted).

■     Within the area of civil regulation, then, a chartered city can enact substantive policies in an area also regulated by state statute unless the local regulation is "incompatible" with state law either in the sense of being "clearly" preempted by express state law or because "both [state law and local law] cannot operate concurrently." Incompatible state and city laws are then assessed under the conflict resolution principles in *LaGrande/Astoria*. But it is presumed that the legislature did not mean to impliedly repeal the provisions of a city's civil or administrative law, and courts should seek to reconcile the operation of both state and local laws if possible.

■     Applying those principles, plaintiff first argues that the city's ordinances are expressly preempted by ORS 90.115, which sets out the scope of the Oregon Residential Landlord and Tenant Act. ORS 90.115, however, declares only the intended operation of state law. It does not explicitly limit the applicability of municipal law. *LaGrande/Astoria* and its progeny require an expressly stated intent to preempt particular municipal enactments in order for a state statute to have that effect. Thus, in *State ex rel Haley v. City of Troutdale*, 281 Or 203, 210-11, 576 P2d 1238 (1978), the Supreme Court rejected the contention that city building code requirements that exceeded the standards of the state building code were preempted by ORS 456.775(1), a statute that provided:

"The state building code shall be applicable and uniform throughout this state and in all municipalities therein, and no municipality shall enact or enforce any ordinance, rule or regulation in conflict therewith."

The court stated that it was "reluctant to assume that the legislature meant to confine the protection of Oregon residents exclusively" to the state code requirements "and to place these beyond the power of local communities to provide additional safeguards[.]" *Id.* at 211. The court found that the statutory text lacked manifest preemptive intent:

"Certainly, that intention is not unambiguously expressed. Until it is, we conclude that local requirements compatible

with compliance with the state's standards are not preempted[.]"

*Id.*

This court decided an analogous preemption issue in *AT&T Communications v. City of Eugene*, 177 Or App 379, 35 P3d 1029 (2001), *rev den*, 334 Or 491 (2002). There, telecommunications companies sought to enjoin the operation of a city ordinance that imposed registration and licensing fees on providers of telecommunications services within the city. *Id.* at 381-84. The plaintiffs argued that the ordinance was preempted by ORS 759.030(1), which provided that "the Public Utility Commission shall have authority to determine the manner and extent of regulation of telecommunications services within the State of Oregon." *Id.* at 394. We first noted that, "when the legislature wishes to preempt local government regulation in a particular field, it knows how clearly to do so."[4] *Id.* at 394-95. We added that the use of the word "preempt" is not necessary to state a preemptive effect, noting a number of state statutes that explicitly displace local regulation.[5] *Id.* at 395. Given the requirement from *LaGrande/Astoria* that the legislature's preemptive intentions be clearly stated, we concluded that ORS 759.090 was not a "clear and unequivocal statement of preemptive intent" because "that is not what the statute says. While it confers authority on the PUC, it does not expressly confer *exclusive* authority on the PUC." *Id.* at 397 (emphasis in original). In

---

[4] As examples of clear preemption of local government regulations, we cited ORS 731.840(4) ("The State of Oregon hereby preempts the field of regulating or imposing" various types of taxes.); ORS 203.090 (providing that various statutes "preempt any laws of the political subdivisions of this state relating to the regulation of private security officers, employers and security services"); ORS 288.610(2) ("ORS 268.605 to 288.695 preempts all statutory or charter authority to issue advance refunding bonds or to effect a forward current refunding."); and ORS 462.100(1) ("The State of Oregon hereby preempts the imposition of taxes on or measured by income on, and the regulation of, race meets.").

[5] The cited examples of an explicit displacement of local regulations were ORS 461.030(1) ("no local authority shall enact any ordinances, rules or regulations in conflict with the provisions hereof" relating to the state lottery); ORS 455.040(1) ("no municipality shall enact or enforce any ordinance, rule or regulation relating to the same matters encompassed by the state building code"); ORS 467.136 ("[a]ny local government * * * ordinance or regulation now in effect or subsequently adopted" with a particular effect "is invalid"); and ORS 634.057 ("No city, town, county or other political subdivision of this state shall adopt or enforce any ordinance, rule or regulation regarding pesticide sale or use * * *.").

*Ashland Drilling, Inc. v. Jackson County*, 168 Or App 624, 634-35, 4 P3d 748, *rev den*, 331 Or 429 (2000), we similarly required clear legislative intent ("an express or otherwise clearly manifested intention that the state's legislation is to be exclusive") to displace county civil regulation of water well construction.[6]

   Tested by those standards, the city's ordinances are not expressly preempted by ORS 90.115. The statute contains neither text stating an express preemption (*e.g.*, "the State of Oregon hereby preempts") nor a clearly manifested intention that the operation of state law be exclusive (*e.g.*, "no city, town, county or other political subdivision of this state shall adopt or enforce any ordinance, rule or regulation regarding" a particular subject area). Instead, ORS 90.115 merely states the territorial scope of the Residential Landlord and Tenant Act (as applicable to "a dwelling unit located within this state"). That is insufficient to state an "apparent" intent to preempt under *LaGrande/Astoria*.

■   Plaintiff next contends that the city's ordinances are implicitly preempted by state law because the ordinances supplement the requirements of the Residential Landlord and Tenant Act. Plaintiff argues that the additional requirements of the city's ordinances—beyond the one-year notice of termination, or at least 180 days' notice of termination together with "space acceptable to the tenant to which the tenant can move" and payment of moving expenses, or $3,500, whichever is less, required by ORS 90.630(5) (2005)—

---

[6] The regulation at issue in *Ashland Drilling* was of a county, whose home rule authority is regulated by a different provision of the Oregon Constitution than the city home rule provisions adopted in 1906. Article VI, section 10, empowering county voters to adopt home rule charters, was adopted in 1958. The court has assumed that the *LaGrande/Astoria* framework applies to county home rule issues as well. *E.g.*, *Pacific N.W. Bell v. Multnomah Co.*, 68 Or App 375, 378 n 2, 681 P2d 797, *rev den*, 297 Or 547 (1984) ("The parties did not brief or argue whether there is any substantive difference between the county and city home rule charter provisions in the constitution. * * * For the purposes of this opinion, we assume that there is not."). As observed by Professor Diller, "[t]his is a curious assumption in light of the textual differences" between the two home rule provisions. Paul A. Diller, *The Partly Fulfilled Promise of Home Rule in Oregon*, 87 Or L Rev 939, 962 n 119 (2009). *Cf. Buchanan v. Wood*, 79 Or App 722, 731 n 1, 720 P2d 1285 (1986) (Joseph, C. J., dissenting) ("I do not necessarily agree that *LaGrande/Astoria v. PERB* has anything to do with a *county* home rule charter under Article VI, section 10." (Citation omitted; emphasis in original.)).

prohibit conversions of mobile home parks that were otherwise unrestricted under state law and are therefore "incompatible" with state law. Under *LaGrande/Astoria*, however, the occupation of a field of regulation by the state has no necessary preemptive effect on the civil or administrative laws of a chartered city. Instead, a local law is preempted only to the extent that it "cannot operate concurrently" with state law, *i.e.*, the operation of local law makes it impossible to comply with a state statute. Here, the provision of any tenant displacement benefits required by the city ordinances still allows compliance with the less-generous requirements of the Residential Landlord and Tenant Act and both policies can operate concurrently.

We have consistently held that a civil regulation of a chartered city will not be displaced under Article XI, section 2, merely because state law regulates less extensively in the same area. Thus, in *Oregon Restaurant Assn. v. City of Corvallis*, 166 Or App 506, 508-09, 999 P2d 518 (2000), we upheld a city prohibition on smoking in all enclosed public places, notwithstanding the less extensive regulations of the Oregon Indoor Clean Air Act, ORS 433.835 to 433.875. We concluded that "we are reluctant to assume that the legislature, in adopting statewide standards, intended to prohibit a locality from requiring more stringent limitations within its particular jurisdiction." *Id.* at 511. We summarized the applicable principles in *Springfield Utility Board v. Emerald PUD*, 191 Or App 536, 541-42, 84 P3d 167 (2004), *aff'd*, 339 Or 631, 125 P3d 740 (2005):

> "A local ordinance is not incompatible with state law simply because it imposes greater requirements than does the state, nor because the ordinance and the state law deal with different aspects of the same subject. Rather, we generally assume that the legislature did not mean to displace local regulation of a local condition unless its intent to do so is apparent."

(Citations omitted.) Thus, we conclude that the city's ordinances are not implicitly preempted as incompatible with state law because the ordinances impose greater requirements on owners of mobile home parks than mandated by the Residential Landlord and Tenant Act.

Plaintiff nonetheless asserts that the ordinances "conflict" with state law because they prohibit, without a permit and the provision of tenant benefits, what state law allows—the conversion of a mobile home park after one years' notice to tenants. Plaintiff relies on *Ashland Drilling, Inc.*, where, in analyzing the preemption of a county civil regulation by state law, we stated that the "relevant question is whether the ordinances 'conflict' with state law, *i.e.*, that the local legislation prohibits what the state legislation permits or permits what the state legislation prohibits." 168 Or App at 635 (citing *City of Portland v. Jackson*, 316 Or 143, 146-47, 850 P2d 1093 (1993)). We then upheld some of the county regulations using the *LaGrande/Astoria* analysis applicable to civil laws, notwithstanding state regulation in the same area. *Id.* at 648.

The preemption test referenced in *Ashland Drilling, Inc.*, and relied on by plaintiff is one that applies to the preemption of local *criminal* laws by a state criminal statute. The preemptive effect of a state criminal statute is determined by a different test than the *LaGrande/Astoria* standards for preemption of civil regulations. As noted earlier, Article XI, section 2, refers to municipal charters as being "subject to the Constitution and criminal laws of the State of Oregon." As Professor Diller observes:

> "Under a hyper-literal interpretation, one might conclude that only charter provisions, and not municipal ordinances, need conform to the constitution and criminal laws of Oregon. This argument is perhaps so self-evidently absurd that it has not been seriously argued. Additionally, one might conclude that charter provisions must conform only to the state's constitution and its criminal laws, but not to the state's civil laws. While this argument has also never been seriously pressed, the amendment's specific mention of 'criminal laws'—and the absence of any specific mention of 'civil laws'—has led to an important distinction in Oregon local government law: the amendment establishes a rebuttable presumption that municipal criminal ordinances are invalid, whereas civil ordinances are presumed valid."

Paul A. Diller, *The Partly Fulfilled Promise of Home Rule in Oregon*, 87 Or L Rev 939, 945 (2009) (footnotes omitted).

The presumptive invalidity of municipal criminal laws that are inconsistent with state criminal laws was established in *City of Portland v. Dollarhide*, 300 Or 490, 501, 714 P2d 220 (1986). That rule was later refined in *Jackson*, 316 Or at 149-51. In *Dollarhide*, the defendant challenged a city's mandatory minimum sentence for the crime of prostitution that was more onerous than the sentence allowed under state law. 300 Or at 493. The court held that, under the wording of Article XI, section 2, it was "left with the inescapable conclusion that the voters who adopted Article XI, section 2[,] envisioned a stricter limitation on the lawmaking power of cities in respect of criminal laws than with regard to civil or regulatory measures." *Id*. at 497. The test for whether a local criminal ordinance conflicts with state law was "whether the ordinance prohibits an act which the statute permits, or permits an act which the statute prohibits." *Id*. at 502 (footnote omitted). The court explicitly stated that this same test was not to be applied to the preemption of civil or administrative laws:

> "The present decision limits only the cities' use of 'criminal laws' within the meaning of Article XI, section 2. As long as a city ordinance employs civil or administrative procedures and sanctions lacking punitive significance, the validity of the ordinance must meet only the tests stated in *LaGrande/Astoria* * * *, for substantive city policies generally, rather than the more stringent constraints of the phrase in Article XI, section 2, that expresses the dominance of state criminal laws over the creation and punishment of local criminal offenses."

*Id*. at 503 (citation and footnote omitted).

In *Jackson*, the court refined the meaning of circumstances where a state law permits what a local criminal ordinance prohibits, concluding that, "[w]hen a local criminal ordinance prohibits conduct, unless the legislature has permitted that same conduct, either expressly or under circumstances in which the legislative intent to permit that conduct is otherwise apparent, the ordinance is not in conflict with state criminal law and is valid under Article XI, section 2, of the Oregon Constitution." 316 Or at 149. Again, the formulation of preempting laws that prohibit conduct that state law permits arises solely in the context of preemption of

municipal criminal laws. We therefore disavow the *dictum* in *Ashland Drilling, Inc.,* that suggests the application of the *Jackson* test for preemption of local criminal laws to municipal civil regulations and conclude that, here, the city's authority to regulate mobile home park conversions was not preempted by state law.

■     Plaintiff alternatively contends that the city lacks authority to regulate the conversion of mobile home parks because that authority is not municipal in character as reserved by the home rule amendments, but instead conflicts with "substantive areas of private law which are the sole domain of the state legislature." Plaintiff reasons that regulation of the landlord-tenant relationship is a traditional function of state government and immune from local policy controls in much the same way as marriage legalization was found to be outside the authority of counties to regulate in *Li v. State of Oregon,* 338 Or 376, 110 P3d 91 (2005). In *Li,* the Supreme Court concluded that a county lacked authority to adopt policies on the issuance of marriage licenses because "the state and, more specifically, the legislature, is the locus of power over marriage-related matters in Oregon." *Id.* at 392. The court determined that the state power "is broad enough to preempt * * * policies generated by a political subdivision of this state, such as the county." *Id.*

The decision in *Li* is not analogous in a number of respects. First, the authority of a chartered county to regulate in the face of competing state law under the county home-rule provision in the state constitution, Article VI, section 10, may be different than the balance struck in *LaGrande/Astoria* under the city home-rule provision of Article XI, section 2. *See* 234 Or App at 473 n 6. At least as to conflicts between substantive laws of a home-rule *city* and the state, the *LaGrande/Astoria* court eschewed conflict resolution on the basis of whether the area of conflict was predominantly of statewide or local concern, overruling in part the legal test for preemption previously used by the court in *State ex rel Heinig v. Milwaukie et al,* 231 Or 473, 479, 373 P2d 680 (1962). That type of comparison, according to the court, "must often involve a choice among values that have no common denominator either in or outside the constitution. * * * Such choices are the essence of political, not judicial,

decision." *LaGrande/Astoria*, 281 Or at 148. Instead, under the principles set out earlier, a substantive civil law of a home-rule city is displaced by state law when it is incompatible with state policy "either because both cannot operate concurrently or because the legislature meant its law to be exclusive." *Id.* at 148-49. The city's ordinances are not incompatible with state policy in those respects.[7]

Finally, to whatever extent *Li* suggests that there are inherent limits to city home-rule authority to regulate transactions or relationships that are traditionally and exclusively regulated under state law, such as laws relating to marriage, the city's ordinances do not fit that category of laws. Unlike marriage legalization, the city's regulation of plaintiff's land uses in general, and preservation of low-income housing in particular, are well within the city's long-standing delegated authority under state statutes and administrative rules. *See, e.g.*, ORS 227.090(1)(a)(C) (authority of city planning commission to establish zoning districts); ORS 227.215(1) (authority of city to adopt development ordinances that regulate "making a material change in the use * * * of * * * land"); ORS 197.175(1) (obligation of city to exercise planning and zoning responsibilities in accordance with statewide planning goals), ORS 197.175(2)(a) (city duty to adopt comprehensive plan consistent with statewide planning goals), and OAR 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(10) (statewide planning goal 10, requiring that cities "encourage the availability of adequate numbers of needed housing units" and defining "needed housing units" to include "manufactured homes,

---

[7] The case law does recognize that home-rule cities lack the power under Article XI, section 2, to limit or expand the official authority of another government's agent. *See City of Eugene v. Roberts*, 305 Or 641, 650, 756 P2d 630 (1988) (home-rule city not empowered "to conscript the services of county and state [election] officials in the conduct of city business"); *Lines v. City of Milwaukie*, 15 Or App 280, 286, 515 P2d 938 (1973) (city cannot add to jurisdiction of circuit court to hear appeals from city civil service commission); *Wilson v. City of Medford et al.*, 107 Or 624, 643, 215 P 184 (1923) (city lacks authority to "expand the duties of state or county officers beyond the limits fixed by state laws"). If a city attempted to compel registration of same-sex marriages by the state register under Article XI, section 2, as did the county in *Li* under different authority, the city would be inhibited by this limitation of its home rule authority. But this case does not involve the deputization of state or county officials by the city to administer its mobile home park conversion ordinances.

whether occupied by owners or renters"); ORS 197.295 - 197.314 (statutory policies on city provision of "needed housing" in urban areas); ORS 197.475 - 197.490 (statutory policies on placement and restrictions on mobile home or manufactured dwelling parks by cities). *Cf.* ORS 100.320 ("A city or county may adopt an ordinance that requires a declarant to pay the moving expense of a tenant vacating a conversion condominium unit."). The area of commerce regulated by the city's ordinances, then, is not within the "locus of power" traditionally and exclusively reserved to the state under applicable case law.

We conclude that the trial court erred in determining that the city's ordinances were preempted or otherwise displaced by state law.

## IV.   SUBSTANTIVE DUE PROCESS

In the city's third assignment of error, it argues that the trial court erred in concluding that the ordinances violated the substantive due process component of the Fourteenth Amendment. Specifically, the trial court concluded:

> "[M]aintaining affordable housing for those who need it, but cannot afford it, is a legitimate government concern. The conditions of obtaining a park closure permit as provided by Ordinance No. 600, however, require the Plaintiff—not the government or the public—to pay tenant relocation expenses, or to pay the assessed values and dismantling costs of the mobile homes of the tenants. Because the required payments are extraordinary and unduly burdensome the Ordinances prohibit termination rights as defined by State statute. The conditions of the Ordinances are unduly oppressive, and in violation of the due process clause of the Fourteenth Amendment to the U.S. Constitution."

The city contends that plaintiff has no property interest at stake so as to raise a cognizable due process claim and that, even assuming plaintiff had such an interest at stake, the ordinances would withstand rational basis review—the proper test of the ordinance's constitutionality—because a "rational legislator could believe that * * * legitimate governmental purposes are advanced by the Ordinance[s]."

In response, we understand plaintiff to argue that the ordinances deprive it of the right to terminate tenancies and exclude others from its property and that the ordinances deprive it of a substantial sum of money in order to regain that right. Although plaintiff does not contest that the ordinances advance a legitimate governmental purpose, plaintiff does contend that the ordinances nonetheless unnecessarily imposed a public burden on a single property owner, were unduly oppressive, and created a retroactive burden that could not have been anticipated and cannot be avoided. Plaintiff's contentions rely heavily on Justice Kennedy's concurrence in *Eastern Enterprises v. Apfel*, 524 US 498, 547-50, 118 S Ct 2131, 141 L Ed 2d 451 (1998), which addresses substantive due process concerns in the context of retroactive legislation, and on reasoning in *Guimont v. Clarke*, 121 Wash 2d 586, 854 P2d 1 (1993), a case decided by the Washington Supreme Court.[8]

■ Assuming without deciding that plaintiff has identified a protected property interest, we conclude that the ordinances in no sense are arbitrary or irrational so as to violate substantive due process. *See City of Cuyahoga Falls v. Buckeye Community Hope Found.*, 538 US 188, 198, 123 S Ct 1389, 155 L Ed 2d 349 (2003) (declining to determine whether the respondents possessed a protected property interest in building permits because the city official's refusal to issue the permits was neither egregious nor arbitrary government conduct). The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits

---

[8] The parties also dispute whether plaintiff has brought a "facial" or an "as-applied" due process constitutional claim. In this case, where there has been *no* executive action against plaintiff and where the only government action to have occurred was enactment of the ordinances by the city council, we construe plaintiff's claim as a facial challenge. *See City of Eugene v. Lincoln*, 183 Or App 36, 41, 50 P3d 1253 (2002) ("A facial challenge asserts that lawmakers violated the constitution when they enacted the ordinance; an as-applied challenge asserts that executive officials * * * violated the constitution when they enforced the ordinance.").

By so construing plaintiff's claim as a facial challenge, we do not intend to offer any opinion as to the merit of pursuing an "as-applied" substantive due process challenge to economic regulation. As we stated over 35 years ago in *American Can Co. v. OLCC*, 15 Or App 618, 644, 517 P2d 691 (1973), a majority of the United States Supreme Court has not invalidated economic legislation on the basis of a substantive due process challenge—whether that challenge be "facial" or "as-applied"—since the Depression.

states from "depriv[ing] any person of life, liberty, or property, without due process of law." US Const, Amend XIV, § 1. As emphasized by the United States Supreme Court, " '[t]he touchstone of due process is protection of the individual against arbitrary action of government,' whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective.' " *County of Sacramento v. Lewis*, 523 US 833, 845-46, 118 S Ct 1708, 140 L Ed 2d 1043 (1998) (citations omitted; brackets in original). The Court has also noted that, "[w]hile due process protection in the substantive sense limits what the government may do in both its legislative and its executive capacities, criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." *Id.* at 846 (citations omitted).

■■ ■■ "[L]egislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and * * * the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 US 602, 637, 113 S Ct 2264, 124 L Ed 2d 539 (1993) (internal quotation marks and citations omitted). Thus, unless the legislation implicates a fundamental right, the party challenging the legislation on due process grounds must show that the legislation bears no reasonable relation to a legitimate governmental interest. *Washington v. Glucksberg*, 521 US 702, 722, 117 S Ct 2258, 138 L Ed 2d 772 (1997).

The governmental action at issue in this case is legislative; we therefore test the constitutionality of the ordinances under rational basis review to determine whether they bear a reasonable relation to a legitimate governmental interest of the city. Plaintiff concedes that the ordinances are aimed at a legitimate governmental interest—that of providing assistance to those seeking affordable housing. We agree with plaintiff's concession and also conclude that the requirements of the ordinances—the filing of a closure impact report and preparation of a relocation plan—bear a reasonable relation to that legitimate governmental interest.

The ordinances, on their face, do not violate the Due Process Clause.

Plaintiff, however, would have us test the constitutionality of the ordinances under the rubric used by the Washington Supreme Court in *Guimont* and, in particular, under that court's use of a "third prong" of due process analysis, "undue oppression." *See* 121 Wash 2d at 608-10. Without deciding whether an "undue oppression" inquiry is properly part of a substantive due process challenge of legislation, we conclude that plaintiff's argument is unavailing. Here, the ordinances afford owners relief if they demonstrate "how application of the ordinance is unduly oppressive under the circumstances then and there existing[.]" That relief provision is sufficient for the ordinances to withstand a facial challenge on the grounds of "undue oppression."

Plaintiff has also argued under *Eastern Enterprises* that, because the ordinances have a retroactive effect, this is one of those rare cases where an economic regulation should be found unconstitutional. *See* 524 US at 547-50 (Kennedy, J., concurring in the judgment and dissenting in part). In *Eastern Enterprises*, the Court considered a constitutional challenge "under the Due Process and Takings Clauses of the Constitution to the Coal Industry Retiree Health Benefit Act of 1992 (Coal Act or Act), 26 USC §§ 9701-9722 (1994 ed and Supp II), which establishes a mechanism for funding health care benefits for retirees from the coal industry and their dependents." *Id.* at 503-04. A plurality of the court concluded, in the context of a takings analysis, that "the Coal Act operates retroactively, divesting Eastern of property long after the company believed its liabilities * * * to have been settled." *Id.* at 534. The plurality went on to conclude that the Coal Act was unconstitutional as applied under the Takings Clause, but declined to address the Act's constitutionality under the Due Process Clause. *Id.* at 538.

Justice Kennedy, however, concurred and would have held the Act unconstitutional on substantive due process grounds. The concurrence noted that "the Court has given careful consideration to due process challenges to legislation with retroactive effects," that "due process protection for

property must be understood to incorporate our settled tradition against retroactive laws of great severity," and that, "[a]s the plurality explains today, in creating liability for events which occurred 35 years ago the Coal Act has a retroactive effect of unprecedented scope." *Id.* at 547-50 (Kennedy, J., concurring in the judgment and dissenting in part). Thus, the concurrence concluded that "[a]pplication of the Coal Act to Eastern would violate the proper bounds of settled due process principles[.]" *Id.* at 550.

Unlike in *Eastern Enterprises*, however, the ordinances do not, on their face, have *any* retroactive active effect, let alone a retroactive effect of unprecedented scope. Plaintiff's statement to the contrary—that the ordinances imposed a multi-million dollar "retroactive" obligation—does not make it so. The ordinances took effect on the dates of their passage and do not include any provision for retroactive application. Put simply, the ordinances do not affect the closures of mobile home parks that had already occurred or transactions that were believed to be long settled. Plaintiff's retroactivity argument is without merit.[9]

For those reasons, we conclude that the trial court erred in determining that the ordinances violate the Due Process Clause of the Fourteenth Amendment.

## V.   CROSS-APPEALS

The judgment concluded that the ordinances conflicted with ORS 90.630, were preempted by state law, and were "unduly oppressive" and in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. It then provided:

> "Plaintiff has pleaded other claims for relief, including a claim that the subject matter of Ordinances No. 600 and 603 is within the exclusive jurisdiction of the Oregon Legislature, as well as claims that the Ordinances violate the takings clauses, the equal protection clauses [*sic*], and the impairment of contract clauses of the State and Federal Constitutions. It is not necessary to decide those claims in

---

[9] In the absence of any violation of federal law, the trial court erred in awarding attorney fees under 42 USC section 1988 for causing plaintiff to be subjected to the deprivation of rights secured by the constitution.

order to grant complete relief to Plaintiff, and all claims of Plaintiff not hereinbefore sustained are dismissed."

Plaintiff cross-appeals that part of the judgment, contending that the court erred in dismissing its takings, impairment of the obligation of contract, and equal protection claims for relief.[10] Plaintiff asks us to reach the merits of those claims and declare the ordinances are unconstitutional and void on those bases. The city would likewise have us reach the merits, but with an opposite result.

On appeal, we decline the parties' invitations to decide plaintiff's takings, impairment of contract, and equal protection claims on their merits in the first instance. The only reason the trial court dismissed those claims was because of its determination on the merits of the preemption and substantive due process claims. Given the trial court's errors in its adjudication of the preemption and due process claims, the reasoning underlying its dismissal of plaintiff's takings, impairment of contract, and equal protection claims is no longer sound. We therefore conclude that the trial court erred in dismissing plaintiff's takings, impairment of contract, and equal protection claims for the reasons that it did.[11] On remand, the court should determine if any of those claims are justiciable and, if so, whether the ordinances on their face are unlawful based on those specific claims.

General judgment reversed on appeal and on cross-appeal and remanded; supplemental judgment for costs and attorney fees vacated and remanded.

---

[10] Plaintiff also cross-appeals on the ground that the court erred in not allowing greater attorney fees under 42 USC section 1988. That argument is without merit, given our reversal of the court's allowance of attorney fees.

[11] Plaintiff's failure to assign error to the trial court's dismissal of its claims for taking of services and separation of powers leaves the trial court's dismissal of those claims undisturbed. We assume that plaintiff's first amended complaint states no further claims under 42 USC section 1983.