342                May 1, 2024                No. 280

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Jordan SCHWARTZ, an individual;
Jonathan Moran, an individual; Serenity Vapors, LLC,
a domestic limited liability company;
Torched Illusions, LLC,
a domestic limited liability company;
Belal Yahya, an individual;
and Hookah Cafe, LLC, dba King's Hookah Lounge,
a domestic limited liability company,
*Plaintiffs-Respondents,*

*v.*

WASHINGTON COUNTY,
a political subdivision of the State of Oregon,
*Defendant-Appellant.*
Washington County Circuit Court
22CV04836; A179834

Andrew Erwin, Judge.

Argued and submitted March 28, 2024.

John Mansfield argued the cause and filed the brief for appellant.

Tony L. Aiello, Jr., argued the cause for respondents. Also on the brief was Tyler Smith & Associates, P.C.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Philip Thoennes, Assistant Attorney General, filed the brief *amicus curiae* for State of Oregon.

Steven C. Berman, Lydia Anderson-Dana, Stoll Stoll Berne Lokting & Shlachter P.C., and Dennis A. Henigan filed the brief *amici curiae* for African American Tobacco Control Leadership Council, American Cancer Society Cancer Action Network, American Heart Association, American Lung Association, American Medical Association, Campaign for Tobacco-Free Kids, Cascade AIDS Project, Kaiser Permanente, Oregon Coalition of Local Health Officials, Oregon Medical Association, Oregon Pediatric

Society, Parents Against Vaping e-cigarettes, Truth Initiative, and Upstream Public Health.

Before Tookey, Presiding Judge, Egan, Judge, and DeVore, Senior Judge.

TOOKEY, P. J.

Reversed and remanded.

**TOOKEY, P. J.**

Defendant Washington County appeals a judgment permanently enjoining it from enforcing Washington County Ordinance (WCO) 878, which bans the sale and distribution of flavored tobacco and flavored synthetic nicotine products in Washington County. The trial court enjoined WCO 878 because it concluded that WCO 878 is preempted by Oregon's statewide scheme for tobacco retail licensure (TRL), ORS 431A.190 to 431A.220.[1] On appeal, in its sole assignment of error, defendant contends that the trial court erred in ruling that WCO 878 is preempted by Oregon's scheme for TRL.[2]

We conclude that WCO 878 is not preempted by Oregon's scheme for TRL. Therefore, we reverse and remand.

## I.   BACKGROUND

Prior to turning to a description of this litigation and an explanation of why Oregon's scheme for TRL does not preempt WCO 878, we provide an overview of that scheme, Washington County's authority as a "home rule" county, and WCO 878.

### A.   *Senate Bill 587 (2021) and TRL in Oregon*

In 2021, the Legislative Assembly passed Senate Bill (SB) 587, which, for the first time, created a statewide scheme for TRL in Oregon. Oregon's scheme for TRL is codified at ORS 431A.190 to 431A.220.

---

[1] ORS 431A.190 to 431A.220 are the codification of Senate Bill (SB) 587 (2021), which was enacted as Oregon Laws 2021, chapter 586. As discussed below, SB 587 created Oregon's scheme for TRL. For the most part, the trial court opinion and the parties' briefing cite sections of SB 587. In this opinion, we refer to the relevant provisions of the Oregon Revised Statutes.

[2] We note that *amicus curiae* the State of Oregon has filed a brief in support of defendant, in which it contends that WCO 878 is not preempted.

We further note that *amici curiae* African American Tobacco Control Leadership Council, American Cancer Society Cancer Action Network, American Heart Association, American Lung Association, American Medical Association, Campaign for Tobacco-Free Kids, Cascade AIDS Project, Kaiser Permanente, Oregon Coalition of Local Health Officials, Oregon Medical Association, Oregon Pediatric Society, Parents Against Vaping e-Cigarettes, Truth Initiative, and Upstream Public Health, have filed a brief in support of defendant, in which they contend that WCO 878 is not preempted and argue that a ban on the sale of flavored tobacco and flavored synthetic nicotine products provides residents of Washington County greater protection against the "harms of flavored tobacco and nicotine products" than the protection offered by Oregon's scheme for TRL.

The purpose of SB 587 was "to improve enforcement of local ordinances and rules, state laws and rules and federal laws and regulations that govern the retail sale of tobacco products[3] and inhalant delivery systems."[4] ORS 431A.192. It aimed to do so by requiring a license or other authorization for a retailer to sell tobacco products and inhalant delivery systems. *See* Audio Recording, Senate Committee on Health Care, SB 587, Mar 1, 2021, at 00:04:50 (comments of Rep Kathleen Taylor), https://olis.oregonlegislature.gov (accessed Mar 3, 2024) (explaining that "[w]ithout requiring a [tobacco retailer] to obtain a license, *** enforcement of our existing laws is difficult").

At the time that SB 587 was enacted, Oregon was in the minority of states that did not require tobacco retailers to hold a license to sell tobacco products, and tobacco was

---

[3] ORS 431A.175(1)(b) defines "tobacco products" as:

"(A) Bidis, cigars, cheroots, stogies, periques, granulated, plug cut, crimp cut, ready rubbed and other smoking tobacco, snuff, snuff flour, cavendish, plug and twist tobacco, fine-cut and other chewing tobaccos, shorts, refuse scraps, clippings, cuttings and sweepings of tobacco and other forms of tobacco, prepared in a manner that makes the tobacco suitable for chewing or smoking in a pipe or otherwise, or for both chewing and smoking;

"(B) Cigarettes as defined in ORS 323.010 (1); or

"(C) A device that:

"(i) Can be used to deliver tobacco products to a person using the device; and

"(ii) Has not been approved by the United States Food and Drug Administration for sale as a tobacco cessation product or for any other therapeutic purpose, if the product is marketed and sold solely for the approved purpose."

*See* ORS 431A.190(5) (providing that for purposes of ORS 431A.190 to 431A.216, "tobacco products" has the meaning given that term in ORS 431A.175); ORS 431A.218(1)(d) (providing that for purposes of ORS 431A.218, "tobacco products" has the meaning given that term in ORS 431A.175).

[4] ORS 431A.175(1)(a)(A) defines "inhalant delivery system," in part, as:

"(i) A device that can be used to deliver nicotine or cannabinoids in the form of a vapor or aerosol to a person inhaling from the device; or

"(ii) A component of a device described in this subparagraph or a substance in any form sold for the purpose of being vaporized or aerosolized by a device described in this subparagraph, whether the component or substance is sold separately or is not sold separately."

*See* ORS 431A.190(2) (providing that for purposes of ORS 431A.190 to 431A.216, "inhalant delivery system" has the meaning given that term in ORS 431A.175); ORS 431A.218(1)(b) (providing that for purposes of ORS 431A.218, "inhalant delivery system" has the meaning given that term in ORS 431A.175).

the only age-restricted product in Oregon that a retailer did not need a license to sell. Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Rachel Banks, Public Health Director, Oregon Health Authority);[5] Audio Recording, Senate Committee on Health Care, SB 587, Mar 1, 2021, at 00:04:15 (comments of Rep Kathleen Taylor), https://olis.oregonlegislature.gov (accessed Mar 3, 2024).

Nevertheless, several political subdivisions in Oregon had enacted ordinances requiring retailers to hold a license or other authorization issued by the political subdivision in order to sell tobacco products, although Washington County did not have such a licensure or authorization scheme in place. *See, e.g.*, Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Rachel Banks) (noting that "[c]ounties such as Multnomah, Clatsop and Klamath are enforcing strong tobacco retail licenses"). The result was that a "patchwork approach of local licensing programs" was starting to develop throughout Oregon. *See* Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Shawn Miller, Northwest Grocery Association) (explaining that the Northwest Grocery Association supported SB 587 because it "has always been concerned with a patchwork approach of local licensing programs and would rather have a coordinated state-wide approach versus additional Counties adopting their own programs").

During the discussions on SB 587, an issue arose regarding what to do about the TRL programs in those political subdivisions that already had their own TRL programs if the state was to begin issuing its own licenses for retail sales under SB 587. Senator Tim Knopp explained that some of the local TRL programs may "go further than" the state TRL scheme likely would and recognized that some

---

[5] The legislative history of SB 587 contains conflicting information regarding the precise number of states that did not have a statewide TRL program at the time SB 587 was under consideration by the Legislative Assembly, but the majority did already have a statewide licensure program in place. *See* Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Rachel Banks) ("Oregon is one of only seven states that does not require tobacco retailers to have a license."); Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Ivy Jones, Associate Government Relations Director, Oregon Medical Association) ("Oregon is one of thirteen states without a statewide licensure [program], and we believe it is time we create one.").

of the political subdivisions with existing TRL programs "would want to keep those [TRL programs] in place." Audio Recording, Senate Committee on Health Care, SB 587, Mar 10, 2021, at 00:45:00 (comments of Sen Tim Knopp), https:// olis.oregonlegislature.gov (accessed Mar 13, 2024). For that reason, the legislature did not want to "preempt[]" those existing local programs, and it also did not want to require a retailer licensed to sell in a particular jurisdiction under a local TRL program also to be required to obtain a state-issued license. *E.g.*, *id.*; Audio Recording, Senate Committee on Health Care, SB 587, Mar 17, 2021, at 00:05:20 (comments of Rep Kathleen Taylor), https://olis.oregonlegislature.gov (accessed Mar 13, 2024) (explaining that it was "not the intent of the bill to stack multiple licenses on retailers").

The result of those discussions was the licensure scheme that was enacted by the legislature and codified at ORS 431A.194, ORS 431A.220, ORS 431A.198, and ORS 431A.218, which, as explained below, includes provisions that permit cities and local public health authorities to continue their licensing programs if those programs were in place on or before January 1, 2021, and, in those jurisdictions, allows retailers to sell tobacco products without a state-issued license if they have a license or other authorization issued by the jurisdiction.

ORS 431A.194 prohibits the retail sale of a tobacco product or an inhalant delivery system from any premises that is not licensed under *either* ORS 431A.198 or ORS 431A.220, providing:

> "A person may not make a retail sale of a tobacco product or an inhalant delivery system at or from a premises located in this state unless the person sells the tobacco product or inhalant delivery system at or from a premises licensed or otherwise authorized under ORS 431A.198 or 431A.220."

ORS 431A.220 provides that cities and local public health authorities that had a TRL program for sales of tobacco products and inhalant delivery systems prior to January 1, 2021, may continue to run and enforce those TRL programs:

"A city or local public health authority that, on or before January 1, 2021, and pursuant to an ordinance adopted by the governing body of the city or local public health authority, enforced standards described in ORS 431A.218 (2)(a) and required that a person that makes retail sales of tobacco products or inhalant delivery systems in an area subject to the jurisdiction of the city or local public health authority hold a license or other authorization issued by the city or local public health authority may continue to enforce the standards and require the license or other authorization on and after January 1, 2022."

However, ORS 431A.218(7) prohibits cities or local public health authorities from requiring "a person that makes retail sales of tobacco products or inhalant delivery systems to hold a license or other authorization issued by the city or local public health authority in addition to [a] license issued" by the state under ORS 431A.198, "except as provided by ORS 431A.220"—that is, unless the local licensure or authorization program was in place on or before January 1, 2021.

Finally, ORS 431A.198 provides for retail licenses for tobacco sales issued by the Department of Revenue (DOR). It requires the DOR to issue a license when certain circumstances are met, but also provides that the DOR cannot require a retailer to have a DOR-issued license to sell tobacco products or inhalant delivery systems when the retailer has a license or other authorization issued by a city or local public health authority pursuant to ORS 431A.220:

"(1)   Except as provided in subsection (8) of this section, the Department of Revenue shall issue licenses to, and annually renew licenses for, a person that makes retail sales of tobacco products or inhalant delivery systems at qualified premises.

"(2)   To be qualified for licensure under this section, a premises:

"(a)   Must be a premises that is fixed and permanent;

"(b)   May not be located in an area that is zoned exclusively for residential use; and

"(c)   Must meet any qualification for engaging in the retail sale of tobacco products and inhalant delivery

systems enacted as an ordinance by the governing body of a local public health authority under ORS 431A.218, provided that the department has knowledge of the qualification pursuant to an agreement entered into under ORS 431A.212.

"* * * * *

"(8)   The department may not require a person that makes retail sales of tobacco products or inhalant delivery systems to obtain a license under this section if the person holds a license or other authorization issued by a city or local public health authority pursuant to ORS 431A.220."

Thus, under ORS 431A.194, ORS 431A.220, ORS 431A.198, and ORS 431A.218, a retailer is required to be licensed or authorized to sell tobacco products and inhalant delivery systems by a political subdivision that had a licensure or authorization system in place prior to January 1, 2021, or by the state, but not by both, *see* Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Shawn Miller, Northwest Grocery Association) ("The bill allows Counties to continue their programs but would not layer the statewide license on top of the local license."); cities and local public health authorities cannot require retailers to obtain a license issued by the city or local public health authority if a TRL program was not in place requiring such license or authorization prior to January 1, 2021; and, where a license or other authorization was required to sell tobacco products in a city or county on or before January 1, 2021, pursuant to a local law, the DOR cannot require a state-issued license to sell tobacco products or inhalant delivery systems in that jurisdiction.

Additionally, in defining the respective roles and responsibilities of the state and political subdivisions, Oregon's scheme for TRL contains a provision expressly allowing the "governing body of a local public health authority" to enforce "standards for regulating the retail sale of tobacco products and inhalant delivery systems" in addition to those imposed by state law.[6] Specifically, as relevant, ORS 431A.218(2) provides:

_____

[6]   ORS 431A.218(1)(a) defines "governing body of a local public health authority" with reference to ORS 431.003, which defines it to mean, among other things, the "governing body of a county."

"Each local public health authority may:

"(a)  Enforce, pursuant to an ordinance enacted by the governing body of the local public health authority, standards for regulating the retail sale of tobacco products and inhalant delivery systems for purposes related to public health and safety in addition to the standards described in paragraph (b) of this subsection, including qualifications for engaging in the retail sale of tobacco products or inhalant delivery systems that are in addition to the qualifications described in ORS 431A.198;

"(b)(A)  Administer and enforce standards established by state law or rule relating to the regulation of the retail sale of tobacco products and inhalant delivery systems for purposes related to public health and safety if the local public health authority and the Oregon Health Authority enter into an agreement pursuant to ORS 190.110[.]"

(Emphases added.)

Further, ORS 431A.218(4) permits local public health authorities to "impose a civil penalty not to exceed $5,000 on a business that engages in the retail sale of tobacco products or inhalant delivery systems for violating a standard described in subsection (2)."

As SB 587 worked its way through the legislative process, it received support from various groups that expressed their support because the bill was largely understood to not prevent political subdivisions from creating additional regulations regarding tobacco products and inhalant delivery systems, as evinced by ORS 431A.218(2)(a). For example, Rachel Banks, Public Health Director at the Oregon Health Authority, testified in support of SB 587, and explained that "a strong tobacco license system does not preempt local governments from enacting stronger, tailored policies that reflect community needs and values" and that SB 587 creates an "opportunity [that] can be *expanded through local action that is more protective* and targets health inequities." Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Rachel Banks (emphasis added)). Gwyn Ashcom, the Tobacco Prevention Coordinator for Washington County Public Health, testified that Washington County supported SB 587, which "ensure[d] local public health *can*

*pass stronger* time, place, manner requirements, and enforcement mechanisms." Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Gwyn Ashcom (emphasis added)); *see also* Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Ivy Jones, Associate Government Relations Director, Oregon Medical Association) ("SB 587 will work to hold retailers accountable and create a statewide program, while also allowing for local jurisdictions to have flexibility.").

Indeed, Ashcom specifically stated that, even if SB 587 was enacted, Washington County intended to move forward with its own ordinance which would include additional "protective strategies," including regulation of flavored tobacco products—specifically, limiting the sale of those products to "establishments that are 21 and over"—and prohibiting price promotions. Audio Recording, Senate Committee on Health Care, SB 587, Mar 1, 2021, at 00:46:25 (comments of Gwyn Ashcom), https://olis.oregonlegislature. gov (accessed Apr 2, 2024). That is, Washington County intended to adopt an ordinance regulating retail sales of tobacco products *even if* SB 587 was enacted and retailers obtained a state issued license.

We also note, however, that there is some testimony in the legislative record that could be read to demonstrate an understanding that SB 587 would prevent regulation of the sale of tobacco products by local governments when a state license had been issued; in other words, when an entity had obtained a state issued license, they could not also be regulated by local governments. *See* Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Shawn Miller, Northwest Grocery Association) ("[B]usinesses would not be regulated by both State and local entities under the passage of SB 587."); Audio Recording, Senate Committee on Health Care, SB 587, Mar 1, 2021, at 00:37:40 (comments of Shawn Miller), https://olis.oregonlegislature. gov (accessed Mar 13, 2024) (stating SB 587 is a "responsible way to look at and prevent underage access to tobacco" and a "better approach than looking at banning different products or banning locations * * * and it makes it statewide").

Ultimately, as enacted, SB 587 did contain a provision expressly preempting cities and local public health authorities from adopting ordinances that prohibit "a premises that makes retail sales of tobacco products or inhalant delivery systems from being located at the same address as a pharmacy," though cities and local public health authorities can continue to enforce such ordinances if the ordinances had been adopted prior to September 25, 2021. ORS 431A.218(6); *see also* Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Shawn Miller) ("[A]dvocates at the County level have pushed extreme license restrictions such as banning tobacco sales of locations that have a pharmacy. *** Senate Bill 587 preempts these local pharmacy restrictions."). But that pharmacy co-location preemption in ORS 431A.218 was, at least as understood by the Oregon Coalition of Local Health Officials and County Commissioners, which supported the SB 587, an exception to SB 587's otherwise non-preemptive approach to local regulation. *See* Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Oregon Coalition of Local Health Officials and County Commissioners) ("[Oregon Coalition of Local Health Officials] and the Counties have agreed to one preemption in the bill. While local public health and local governments are usually very opposed to preemption we have agreed to this one as a compromise to pass this bill this session. We would not support another preemption that further restricts local public health authorities from regulating the time, place, and manner in which tobacco products, including e-cigarettes, are sold.").

### B.    *Washington County's Authority as a Home Rule County*

In 1958, Oregon voters approved a constitutional amendment allowing counties to adopt a home rule charter.[7] As amended, Article VI, section 10, of the Oregon Constitution provides, in pertinent part:

"The Legislative Assembly shall provide by law a method whereby the legal voters of any county, by majority vote of

---

[7] In the United States, "home rule" generally means an arrangement under which units of local government are "permitted to frame their own charters and regulate their local affairs." Orval Etter, *County Home Rule in Oregon*, 46 Or L Rev 251, 252 (1967) (internal quotation marks omitted).

such voters voting thereon at any legally called election, may adopt, amend, revise or repeal a county charter. *A county charter may provide for the exercise by the county of authority over matters of county concern.*"[8]

(Emphasis added.)

In 1962, Washington County adopted a home rule charter that provides it with "authority over matters of County concern, to the full extent granted or allowed by the Oregon Constitution and laws of the State." Washington County Charter, ch II, § 20.

We note that, in addition to the preemption issue that is now before us, plaintiffs' complaint alleged that WCO 878 violated Article VI, section 10, of the Oregon Constitution, because, in plaintiffs' view, "[i]t is a matter of state concern, and not county concern, whether to prohibit or permit the sale of products for which one is required to obtain a license under SB 587." The trial court dismissed that claim on the merits, and plaintiffs have not assigned error to that ruling on appeal. Thus, for purposes of this appeal, we assume that, absent preemption, the enactment of WCO 878 was a valid exercise of Washington County's home rule authority under its charter.

C.  *WCO 878*

On November 2, 2021, the Board of Commissioners of Washington County, adopted WCO 878, which is entitled, "An ordinance to Prohibit Flavored Tobacco, Flavored Synthetic Nicotine, Prohibiting Coupon and Price Promotions, and Repealing Ordinance 599." In WCO 878, the Board of Commissioners stated the finding, among others that it expressed, that "youth tobacco use is increasing in Washington County and the tobacco industry continues to use strategies that target child including the advent of new products, like flavored products, synthetic nicotine and inhalant delivery systems (vape products)."

_____

[8] Additionally, in 1973, the legislature enacted ORS 203.035(1), which currently provides that "the governing body or the electors of a county may by ordinance exercise authority within the county over matters of county concern, to the fullest extent allowed by Constitutions and laws of the United States and of this state." That statute "obliterate[d] most distinctions between the powers of general law counties and home rule counties." *Allison v. Washington County*, 24 Or App 571, 581, 548 P2d 188 (1976).

WCO 878 provides, as relevant here, that in Washington County:

> "No person shall sell, offer for sale, or otherwise distribute any flavored tobacco product or flavored synthetic nicotine product."

WCO 878, Exhibit A, 2.30(B).

WCO 878 defines "flavored product," in part, as:

> "Any synthetic nicotine product or tobacco product that contains a taste or smell, other than the taste or smell of tobacco, that is distinguishable by an ordinary consumer either prior to or during the consumption of the product, including, but not limited to, any taste or smell relating to chocolate, cocoa, menthol, mint, wintergreen, vanilla, honey, molasses, fruit, or any candy, dessert, alcoholic beverage, herb, or spice."[9]

WCO 878, Exhibit A, 2.20(B).

### D.  *The Instant Litigation*

On April 29, 2022, plaintiffs—businesses with locations in Washington county and owners of those businesses—filed a complaint in the Washington County Circuit Court seeking declaratory and injunctive relief. Plaintiffs' complaint alleged that WCO 878 is preempted by Oregon's scheme for TRL, *i.e.*, ORS 431A.190 to 431A.220, and sought an injunction against defendant enforcing WCO 878. Plaintiffs' complaint also alleged that WCO 878 "cannot apply to incorporated cities within Washington County."

On what the trial court treated as cross-motions for summary judgment, the trial court concluded that WCO 878 is preempted by state law and enjoined its enforcement. In light of that ruling, the trial court dismissed as moot plaintiffs' claim that WCO 878 could not apply to incorporated cities within Washington County.

Defendant appeals the resulting judgment.[10]

---

[9] Excluded from the definition of "flavored product" in WCO 878 is "any product that has been approved by the United States Food and Drug Administration for sale as a tobacco cessation product or for any other therapeutic purpose if the product is marketed and sold solely for the approved purpose." WCO 878, Exhibit A, 2.20(B).

[10] Plaintiffs' complaint also alleged that WCO 878 violated Article I, section 20, of the Oregon Constitution and that it was "arbitrary and capricious." As with the Article VI, section 10, claim, discussed above, the trial court dismissed those

## II.   ANALYSIS

On appeal, in its sole assignment of error, defendant contends that the trial court erred in concluding that WCO 878 is preempted by Oregon's scheme for TRL. Plaintiffs disagree; they contend that the trial court was "correct in ruling that Senate Bill 587" preempted WCO 878.

"The analytical process for determining whether state law preempts a local law in Oregon is well established." *Owen v. City of Portland*, 368 Or 661, 667, 497 P3d 1216 (2021). The question is whether "a local law is 'incompatible' with state law, 'either [1] because both cannot operate concurrently or [2] because the legislature meant its law to be exclusive.'" *Id.* (quoting *La Grande/Astoria v. PERB*, 281 Or 137, 148, 576 P2d 1204, *aff'd on reh'g*, 284 Or 173, 586 P2d 765 (1978)). We understand plaintiffs to contend that WCO 878 is preempted for both reasons.

### A.   *The Legislature Did Not Intend for SB 587 to be Exclusive*

We first turn to whether the "legislature meant its law to be exclusive"; that "boils down to whether the legislature 'unambiguously expressed its intent' to preempt laws like the ordinance." *Owen*, 368 Or at 668 (quoting *Rogue Valley Sewer Services v. City of Phoenix*, 357 Or 437, 454, 353 P3d 581 (2015)). Put another way, "we assume legislature does not mean to displace local civil or administrative regulation of local conditions by a statewide law unless that intention is apparent." *Rogue Valley Sewer Services*, 357 Or at 450 (internal quotation marks omitted). As is the case in other contexts, "we ascertain the intentions of the legislature by examining the text of the statute in its context, along with any relevant legislative history, and, if necessary, relevant canons of statutory construction." *Board of Cty. Comm. of Columbia Cty. v. Rosenblum*, 324 Or App 221, 239, 526 P3d 798 (2023).

At the outset, "we note that, when the legislature wishes to preempt local government regulation in

claims on the merits, and plaintiffs have not assigned error to those rulings. Nor have plaintiffs assigned error to the trial court's ruling dismissing their claim concerning application of WCO 878 to incorporated cities within Washington County as moot.

a particular field, it knows how clearly to do so." *AT&T Communications v. City of Eugene*, 177 Or App 379, 394, 35 P3d 1029 (2001), *rev den*, 334 Or 491 (2002); *see, e.g.*, ORS 166.170(1) ("Except as expressly authorized by state statute, the authority to regulate in any matter whatsoever the sale, acquisition, transfer, ownership, possession, storage, transportation or use of firearms or any element relating to firearms and components thereof, including ammunition, is vested solely in the Legislative Assembly."); ORS 801.038 ("A city, county or other local government may not enact or enforce any charter provision, ordinance, resolution or other provision regulating the use of cellular telephones in motor vehicles.").

As indicated above, SB 587 contained certain provisions preempting local governments from regulating aspects of the sale of tobacco products and inhalant delivery systems. ORS 431A.218(6)(a) (prohibiting cities and local public health authorities from adopting ordinances that prohibit "a premises that makes retail sales of tobacco products or inhalant delivery systems from being located at the same address as a pharmacy"); ORS 431A.218(7) (prohibiting cities and local public health authorities from requiring a license in addition to a license issued under ORS 431A.218, except as provided by ORS 431A.220, which, as noted, provides that cities and local public health authorities that had a TRL program for sales of tobacco products and inhalant delivery systems prior to January 1, 2021, may continue to run and enforce those TRL programs).

But Oregon's scheme for TRL does not contain language indicating that the legislature wished to entirely preempt local governments from regulating tobacco and synthetic nicotine products. To the contrary, as set forth above, ORS 431A.218(2)(a) expressly allows "the governing body of the local public health authority" to enforce ordinances that set "standards for regulating the retail sale of tobacco products and inhalant delivery systems for purposes related to public health and safety *in addition to* the standards" prescribed by state law. (Emphasis added.)

And that is what Washington County did with its prohibition on "flavored tobacco" sales set forth in WCO

878—which we understand to largely amount to a restriction on certain ingredients. *See Webster's Third New Int'l Dictionary* 2223 (unabridged ed 2002) ("standard" can mean, among other things, "something that is established by authority * * * as a model or example to be followed" and "a definite level or degree of quality that is proper and adequate for a specific purpose"). That is, WCO 878 is a standard as authorized by ORS 431A.218(2)(a).

If the legislature had intended for SB 587 to divest political subdivisions of any ability to regulate tobacco products, we can see no purpose in including the provision in ORS 431A.218(6)(a) prohibiting cities and local public health authorities from adopting ordinances that prohibit a premises that makes retail sales of tobacco products from being located at the same address as a pharmacy. *State v. Stamper*, 197 Or App 413, 418, 106 P3d 172, *rev den*, 339 Or 230 (2005) ("[W]e assume that the legislature did not intend any portion of its enactments to be meaningless surplusage."). That provision would have been surplusage, and we do not think it is; it shows that the legislature thought about preemption, and acted where it thought action was necessary.

The understanding that the legislature did not intend to preempt local government regulation of tobacco and nicotine product sales in enacting SB 587 is also supported by the legislative history of that bill as set forth above, which, we think, reflects an understanding that SB 587, although intended to prevent a "patchwork quilt" of licensure requirements, was not intended to preempt local governments from "enacting stronger, tailored policies that reflect community needs." Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Rachel Banks); *see also, e.g.*, Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Gwyn Ashcom). As described above, the limited preemptive effect of SB 587 was discussed during the hearings on SB 587.

Further, as discussed above, although there was some testimony in the legislative history that could be read to demonstrate an understanding that SB 587 would prevent regulation of the sale of tobacco products by local

governments when a state license had been issued, *e.g.*, Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Shawn Miller, Northwest Grocery Association), it appears to us that that understanding was, at most, a minority perspective, and it is inconsistent with the plain text of ORS 431A.218(2)(a), which expressly allows for the adoption and enforcement of local ordinances which set "standards for regulating the retail sale of tobacco products *** in addition to the standards" prescribed by state law. *State v. Kelly*, 229 Or App 461, 466, 211 P3d 932, *rev den*, 347 Or 446 (2009) ("Cherry-picked quotations from single legislators or of nonlegislator witnesses, are likely to be given little weight, as the likelihood that such scraps of legislative history represent the views of the institution as a whole is slim."); *Suchi v. SAIF*, 238 Or App 48, 55, 241 P3d 1174 (2010), *rev den*, 350 Or 231 (2011) ("Even assuming that the legislative history supported claimant's interpretation, we are required not to construe a statute in a way that is inconsistent with its plain text.").

For those reasons, in our view, the legislature did not "unambiguously express[] its intent to preempt laws like the ordinance." *Owen*, 368 Or at 668 (internal quotation marks omitted). We thus conclude that legislature did not mean "for its law to be exclusive." *Id.* at 667 (internal quotation marks omitted).

B.  *WCO 878 Can Operate Concurrently with ORS 431A.190 to 431A.220*

We turn to the question whether WCO 878—or at least the prohibition on the sale of flavored tobacco and flavored synthetic nicotine products contained therein—is preempted because it "cannot operate concurrently" with ORS 431A.190 to 431A.220. Similar to our conclusion above, we conclude that WCO 878 it is not so preempted.

We have explained that "[a] local ordinance is not incompatible with state law simply because it imposes greater requirements than does the state." *Thunderbird Mobile Club v. City of Wilsonville*, 234 Or App 457, 474, 228 P3d 650, *rev den*, 348 Or 524 (2010) (internal quotation marks omitted). Instead, "a local law is preempted only to

the extent that it 'cannot operate concurrently' with state law, *i.e.,* the operation of local law makes it impossible to comply with a state statute." *Id.*; *see also Rogue Valley Sewer Services*, 357 Or at 455 (citing *Thunderbird Mobile Club*, 234 Or App at 474, for that proposition).

As described above, ORS 431A.190 to ORS 431A.220 provide for a statewide TRL scheme in Oregon. That scheme prohibits the "retail sale of a tobacco product or an inhalant delivery system at or from a premises located in this state unless the person sells the tobacco product or inhalant delivery system at or from a premises licensed or otherwise authorized under ORS 431A.198 [providing for licenses issued by DOR] or ORS 431A.220 [providing for licenses or other authorization issued by political subdivisions]." In contrast, WCO 878 prohibits the sale and distribution of "any flavored tobacco product or flavored synthetic nicotine product" in Washington County.

WCO 878 is not preempted merely because it prohibits the sale of a product which is allowed, in certain circumstances, to be sold under Oregon's scheme for TRL. *Oregon Restaurant Assn. v. City of Corvallis*, 166 Or App 506, 511, 999 P2d 518 (2000) ("[W]e are reluctant to assume that the legislature, in adopting statewide standards, intended to prohibit a locality from requiring more stringent limitations within its particular jurisdiction."); *see also Thunderbird Mobile Club*, 234 Or App at 460 (concluding ordinances requiring owners of mobile home parks to obtain a closure permit from the city and to compensate displaced tenants were not preempted by the Oregon Residential Landlord and Tenant Act, even though "the ordinances impose[d] greater requirements on owners of mobile home parks than mandated by the Residential Landlord and Tenant Act").

Because a retailer can comply with both Oregon's scheme for TRL and WCO 878's prohibition on the sale and distribution of flavored tobacco and flavored synthetic nicotine products in Washington County by not selling those products in Washington County, compliance with both WCO 878 and ORS 431A.190 to 431A.220 is not "impossible"; in other words, because Oregon's scheme for TRL merely permits license holders to sell tobacco products and inhalant

delivery systems, but does not require tobacco retailers to sell any particular type of tobacco product or inhalant delivery system, Oregon's scheme for TRL can operate concurrently with WCO 878, which prohibits the sale of a certain type of tobacco and nicotine product.

On appeal, plaintiffs point to a different test for preemption than we apply in this opinion: They contend that preemption of a local ordinance occurs "when a statute permits actions that [the] ordinance prohibits, or prohibits actions that [the] ordinance permits." The difficulty with plaintiffs' argument is that, as explained in *Thunderbird Mobile Club*, that test is the test that "applies to the preemption of local criminal laws by a state criminal statute." 234 Or App at 475 (so noting, and explaining that the "preemptive effect of a state criminal statute is determined by a different test than the *** standards for preemption of civil regulations"). That test is not applicable here.

### III.   CONCLUSION

In sum, we conclude that the trial court erred when it concluded that WCO 878 is preempted by ORS 431A.190 to 431A.220.

Reversed and remanded.