IN THE OREGON TAX COURT
REGULAR DIVISION
Personal Income Tax

| | | |
|---|---|---|
| CHARLES RINGO, | ) | |
| | ) | |
| Plaintiff, | ) | **TC 5480** |
| v. | ) | |
| | ) | **ORDER GRANTING DEFENDANT'S** |
| DEPARTMENT OF REVENUE, | ) | **MOTION FOR PARTIAL SUMMARY** |
| State of Oregon, | ) | **JUDGMENT AND DENYING** |
| | ) | **PLAINTIFF'S MOTION FOR** |
| Defendant. | ) | **SUMMARY JUDGMENT** |

I.   INTRODUCTION AND CONCLUSIONS

Plaintiff appeals from a Magistrate Division decision upholding Defendant's assessment

for 2018 of additional personal income tax, penalties, and interest totaling $44,766.79.  After an

agreed adjustment,[1] the assessment is based on Defendant's conclusion that Byzantium Corp.

(Byzantium), an S corporation of which Plaintiff was an 85 percent shareholder and manager,

underreported its gross receipts by $369,777. [2]  Plaintiff denies any underreporting; Plaintiff

asserts that Byzantium's only gross receipts are the $52,500 reported on its return.

Plaintiff seeks full summary judgment, based on three legal theories.  Plaintiff first argues

that Defendant has failed to satisfy its requirements under this court's summary judgment

---

[1] Defendant made a small adjustment ($2,036.09) for improper deductions.  (*See* Am Compl, 3, ¶ 16; Ans Am Compl, 4, ¶16.)

[2] As discussed below, Defendant's conference decision explaining the assessment contains two numbers purporting to represent "estimated fair market value (FMV) of an adjusted inventory":  $369,780 and $369,777. (Ptf's Decl of Ringo, Ex 6 at 3.)  The court is unable to resolve the discrepancy but considers the difference immaterial because the lower number, $369,777, was used to compute the additional tax assessed.  (*See id.* at 2.)

standards to "produc[e] evidence" of "specific facts" supporting the amount of additional gross receipts reflected in the assessment. Tax Court Rule (TCR) 47 C, 47 D. (*See* Ptf's Reply & Resp at 1-3.) Second, Plaintiff argues, without explanation, that Defendant violated his procedural due process rights. Third, Plaintiff argues that his substantive due process rights have been violated because Defendant arrived at its sevenfold increase in gross receipts through "sheer speculation," "without any evidence." (Ptf's Mot Summ J at 2, 15.)

As to Plaintiff's first theory, Defendant does not cross-move for summary judgment to establish the correctness of the assessed amount; Defendant seeks only to defeat Plaintiff's motion in order to allow the correct amount to be determined at trial. Defendant argues that record evidence of Plaintiff's lack of credibility creates a genuine issue of material fact, because Plaintiff's declaration is the only evidence that Byzantium's gross receipts were limited to those reported on its return. (*See* Def's Resp & XMot Part Summ J at 3.) In Defendant's view, it has no need to point to specific facts supporting its much higher assessment amount, which it resorted to only because Plaintiff failed to keep and produce Byzantium's records as required by law. (*See id.* at 8-14.) The court agrees with Defendant. *See Barnett v. Redmond School District 2J*, 209 Or App 724, 734 (2006) (applying "principle that, when the nonmovant can show some specific factor that directly places the affiant's credibility in jeopardy, that showing raises a fact issue sufficient to defeat summary judgment."); *To v. State Farm Mutual Ins.*, 319 Or 93, 105, 873 P2d 1072, 1079 (1994) ("If the nonmoving party produces specific facts related to the affiant's credibility, then summary judgment may be inappropriate, particularly * * * where 'the knowledge of the events or occurrences on which the action is based lies exclusively within the control of the party moving for summary judgment.'"). The court will deny Plaintiff's motion as to this issue, leaving the correct assessment amount to be determined at trial.

The parties cross-move as to Plaintiff's second and third theories, that his due process rights have been violated. Plaintiff raises a procedural due process argument but makes no specific allegations, and the court finds no evidence in the record that could cause a reasonable juror to find unfairness in his audit, his administrative appeal that led to the conference decision and notice of assessment, or his judicial appeal in the Magistrate Division. Plaintiff instead "focus[es] on the violation of his substantive due process." (Ptf's Reply at 5.) Plaintiff attacks the methodology Defendant used to derive the assessment, on the grounds that Defendant used data Byzantium reported to the Oregon Liquor Control Commission (OLCC) knowing that the data were inaccurate.[3] However, the court concludes that, given the largely self-created circumstances in Plaintiff's case, the result of that methodology does not "shock the conscience." *See County of Sacramento v. Lewis*, 523 US 833, 845-51, 118 S Ct 1708, 140 L Ed 2d 1043 (1998) (applying the shock-the-conscience test). Nor does Defendant's use of a square footage-based methodology to check the assessment, as that use did not cause Defendant to increase the assessment amount. The court will deny Plaintiff's motion and grant that of Defendant as to the due process issue.

## II. FACTS

Except as indicated, the following facts are not in dispute.

*S corporation.* Byzantium filed an Oregon tax return for 2018. (Am Compl at 2, ¶ 6; Answer Am Compl at 2, ¶ 6.) Byzantium was an S corporation, a so-called "passthrough entity," meaning that it generally was not subject to federal or Oregon income tax. (*See* Am Compl at 1, ¶ 1; Ans Am Compl at 1, ¶ 1); IRC § 1363(a) (2018); ORS 314.732. Instead, items such as gross

---

[3] The full name of the OLCC has since been changed to the Oregon Liquor and Cannabis Commission. *See* Or Laws 2021, ch 351.

income and deductions were required to be included on the tax returns of its shareholders in proportion to their pro rata shares. *See* IRC § 1366(a)(1) (2018); ORS 314.734; *see generally* Eustice, Kuntz & Bogdanski, *Federal Income Taxation of S Corporations* ¶ 7.01 (rev Mar 2026) ("The system that transfers income and losses to the shareholders is generally referred to as a pass-through system"). Plaintiff's pro rata share was 85 percent; thus, nearly all of Byzantium's items were reportable on Plaintiff's personal income tax return. (*See* Ptf's Decl of Ringo at 3 ¶ 9; *id*., Ex 2 at 2 (Defendant's conference decision); Ptf's Mot Summ J at 3.)

*Operation and management; OLCC settlement agreement.* Byzantium was a cannabis business, and Plaintiff managed the operation. (*See* Ptf Mot Summ J at 3.) Starting sometime in 2017, Byzantium held a license from the OLCC. (*See* Def's Decl of Rieder, Ex B at 2 (discussing Marijuana License Acknowledgment dated September 21, 2017).) The OLCC cancelled Byzantium's producer license on September 21, 2018, upon the commission's approval of a stipulated settlement agreement signed by Plaintiff. (*See id.* at 4-5.) Plaintiff, as "President/Stockholder" of Byzantium, agreed to not contest thirteen violations of Oregon law, and to accept, as penalties, license cancelation and a letter of reprimand.[4] Of particular relevance

---

[4] The settlement agreement provides in part:

"Violation Number One

"On or before March 18, 2018, Licensee operated other than its license permits when Licensee and/or Licensee's employees, agents or representatives sold, delivered, or transported cannabis items other than to the licensed premises of a cannabis processor, wholesaler, retailer, laboratory, non-profit dispensary, or research certificate holder. This is a violation of ORS 475B.206(1), OAR 845-025-1300(1)(h), and OAR 845-025-2020(2).

"Violation Number Two

"On or about April 3, 2018, Licensee and/or Licensee's employees, agents or representatives entered data into the METRC Cannabis Tracking System (CTS) that did not fully and transparently account for all inventory tracking activity, when the account for Licensee's employee Andrew Heller was used to report that cannabis plants * * * were destroyed due to pests, *which were intentional misrepresentations* in that these plant tags were recovered from a butane honey oil (BHO) explosion * * * on or about March 18, 2018. This is a violation of OAR 845-025-7540(1), (4).

"Violation Number Three

"On or about April 3, 2018, Licensee and/or Licensee's employees, agents or representatives entered data into the METRC Cannabis Tracking System (CTS) that *did not fully and transparently account for all inventory tracking activity*, when the account for Licensee's Employee Andrew Heller was used to report that [a] cannabis plant * * * was destroyed due to powdery mildew, *which was intentional misrepresentation* in that the plant was found at the premises in the drying room on April 19, 2018. This is a violation of OAR 845-025-7540(1), (4).

"Violation Number Four

"On or before April 19, 2018, Licensee and/or Licensee's employees , agents or representatives *intentionally destroyed , damaged , altered, removed or concealed potential evidence*, or attempted to do so, or asked or encouraged another person to do so , when they caused certain entries in the Visitors Log Book for the premises to be blacked out. This is a violation of OAR 845-025-8540(4)(a).

"Violation Number Five

"From about September 21, 2017 to the present, Licensee and /or Licensee's employees, agents or representatives *failed to disclose* the interest in the licensed business of David Carl Paulsen, a person with an ownership interest in Licensee within the meaning of OAR 845-025-1045(3). This is a violation of OAR 845-025-1115(2)(c).

"Violation Number Six

"On or about September 21, 2017, Licensee's disclosed principals, Charles Ringo and Leonard Peverieri, signed and submitted to the Commission a Marijuana License Acknowledgement stating, *inter alia*, 'I have reviewed all information submitted as part of the application including, but not limited to, information regarding ... financial involvement in the business. All information submitted is true and correct to the best of my knowledge.' At the time, Ringo and /or Peverieri knew or should have known that David Carl Paulsen had an undisclosed ownership interest in Licensee within the meaning of OAR 845-025-1045(3), and /or an undisclosed financial interest in Licensee within the meaning of OAR 845-025-1015(23), and therefore the signing and submission of the Marijuana License Acknowledgement constitutes a *false statement to the Commission*. This is a violation of OAR 845-025-1115(2)( a)(B).

"Violation Number Seven

"On or before April 19, 2018, Licensee and/or Licensee's employees, agents or representatives entered data into CTS that *did not fully and transparently account for all inventory tracking activity*, with respect to approximately 268 unaccounted-for packages of cannabis seeds created in CTS * * * which were reported in CTS as present on the premises as of April 19, 2018, but which in fact were not present on the premises as of that date. This is a violation of OAR 845-025-7540(1).

"Violation Number Eight

"On or before April 19, 2018, Licensee and/or Licensee's employees, agents or representatives entered data into CTS that *did not fully and transparently account for all inventory tracking activity*, with respect to mature cannabis plants, plastic totes containing useable cannabis, and bags of cannabis bud/flower found on the premises that were not entered into or tracked in CTS. This is a violation of OAR 845-025-7540(1).

to Plaintiff's credibility are the stipulations by Plaintiff that he made "intentional misrepresentations" of entries in the state's cannabis tracking system (Violations Number Two and Three); made a "false statement to the commission" (Violation Number Six); "intentionally destroyed, damaged, altered, removed or concealed potential evidence, or attempted to do so, or asked or encouraged another person to do so" (Violation Number Four); "failed to disclose" required information (Violation Number Five); and failed to "fully and transparently account for all inventory tracking activity" (Violations Number Two, Three, Four, and Eight).

*Income and financial records.* On its tax return for 2018, Byzantium reported gross sales of $52,500, of which at least $35,500 was received in cash from sales of cannabis.[5] (*See* Am Compl at 2, ¶ 6; Ans to Am Compl at 2, ¶ 6 ("Defendant agrees that Byzantium reported gross

---

"Violation Number Nine

"On or before April 19, 2018, Licensee and/or Licensee's employees, agents or representatives failed to tag individual cannabis plants with CTS unique identification (UID) tags, with respect to several mature cannabis plants found on the premises that were not tagged with a CTS UID. This is a violation of OAR 845-025-7520(1)(c).

"Violation Number Ten

"On or before April 19, 2018, Licensee and/or Licensee's employees, agents or representatives failed to establish a cannabis cultivation batch in CTS that was found on the premises, and assign a CTS unique identification number to that cultivation batch. This is a violation of OAR 845-025-7570(1).

"Violation Number Eleven

"On or before April 19, 2018, Licensee and/or Licensee's employees, agents or representatives failed to properly tag inventory with CTS UID tags, with respect to plastic totes of useable cannabis and bags of cannabis bud/flower found on the premises that were not aged with CTS UIDs. This is a violation of OAR 845-025-7520(1)(d)."

(Def's Decl of Rieder, Ex B, "Stipulated Settlement Agreement for Entry into Final Order" (Sept 21, 2018) (emphases added).)

[5] Plaintiff pleads that "[a]lmost all of this revenue [i.e., the $52,500] was from illegal cannabis sales," *i.e.,* "sales on the black market." (*See id.;* Ptf's Mot Summ J at 2.) In his declaration, however, Plaintiff alleges that $17,000 of the $52,500 consisted of rent payments from a company called Green Acres Extracts, LLC, which leased Byzantium's facility. (*See* Ptf's Decl of Charles Ringo 2-3, ¶ 6.) According to the declaration, "$35,000.00 * * * is all of the revenue Byzantium received from cannabis sales in 2018." (*Id.* at 2, ¶ 5.)

sales of $52,500 on its 2018 tax return. Defendant agrees that nearly all the revenue was from unlawful cannabis sales. Defendant disagrees that the reported gross sales is an accurate figure.") Plaintiff deposited $22,400 of this cash into a Wells Fargo bank account in the name of "Epic Coffee, LLC" and $9,000 of this cash into a different Wells Fargo account, in the name of "R Bar R LLC." The latter funds were immediately transferred from the R Bar R account to Plaintiff's law office overhead account at U.S. Bank, in the name of "Charlie Ringo Attorney at Law PC." (*See* Ptf's Decl of Ringo at 2, ¶ 3, Ex 2, Ex. 3.) Plaintiff admits that approximately $4,100 from cash sales of cannabis was never deposited into any bank account; he asserts that that amount was "retained as cash for general operating purposes." (*Id.* at 2, ¶4.)

Plaintiff tracked Byzantium's 2018 cannabis sales "by handwriting on a single piece of paper." Plaintiff acknowledges that he destroyed that sales record in 2019 because he "feared a raid by law enforcement." (*See id.* at 7, ¶ 25.)

Plaintiff alleges that Byzantium suffered an incident of theft:

> "During the course of its cannabis operation Byzantium was the victim of substantial theft. During the audit process the Department's auditor, William Swanson, asked me why I did not report the theft to the police. I replied that it would be problematic to report illegal activity to the police."

(*Id.* at 8, ¶ 27.) Defendant treats Plaintiff's statement as an admission undermining his credibility as to the accuracy of his accounting of Byzantium's income.

*Defendant's conference decision.* On October 20, 2021, Defendant issued a conference decision upholding an auditor's March 8, 2021, notice of deficiency that had been issued by Defendant's auditor:[6]

---

[6] A "conference decision" is a written determination by Defendant resulting from an administrative appeal following an audit. *See* OAR 150-305-0204(1) ("A conference is a meeting with a department conference officer who reviews the reasons for the adjustment with the taxpayer. The purpose of a conference is to allow a person to obtain an informal department review of a deficiency notice or other department action if the person believes the

"For the instant year, BC reported $52,500 in marijuana sales, $73,518 in cost of goods sold (COGS), no expenses, and a net loss of $21,018 on federal Form 1120S. No subtractions were claimed on Oregon Form OR-20-S. You reported a pass-through loss from BC of $17,865 ($21,018 x 85% =$17,865) on Schedule E of your personal income tax return.

"At audit, the loss claimed by BC was changed to a profit of $370,708 due to adjustments increasing sales income by $369,777 and decreasing COGS (labor) by $21,949 for total adjustments of $391,726. Your personal income tax return was adjusted to reflect your $332,967 share of the adjustments ($391,726 x 85% = $332,967).

(Ptf's Decl of Ringo, Ex 6 at 1-2; *see* Ptf's Mot Summ J at 9.)

The auditor determined Defendant's $369,777 increase in sales using data Byzantium reported to the OLCC and an apparently oral estimate from Plaintiff of Byzantium's average sale price per pound of product. (*See* Ptf's Decl of Ringo, Ex 6 at 3-4.) The OLCC required licensees to track the growth, disposal, and transfer of cannabis through a reporting and inventory system. (*See* Ptf's Mot Summ J at 9; Decl of Ringo at 5, ¶16.)[7] The parties refer to that system as "METRC," "CTS," or the Marijuana Enforcement Tracking Reporting Compliance Cannabis Tracking System.

As summarized in the conference decision:

"Due to a paucity of recordkeeping, the auditor used the data you entered into the METRC system to formulate an estimated fair market value (FMV) of an adjusted inventory.

---

notice or action is incorrect.").

[7] OLCC rules in 2018 required tracking of marijuana items from "seed to sale." *See* OLCC Administrative Order 15-2017 at 3, *available at* https://records.sos.state.or.us/ORSOSWebDrawer/Recordhtml/6843213 (amending OAR 845-025-1015(11) effective Dec 28, 2017, and defining Cannabis Tracking System); *id*. at 4 (amending OAR 845-025-1015(32) and defining "Inventory Tracking" as "all of the activities and documentation processes required by these rules to track marijuana and marijuana items from seed to sale in the cannabis tracking system"); *id*. at 40 (amending OAR 845-025-2080 and requiring weight entries in CTS for usable marijuana, waste, and moisture loss after harvest); *id*. at 91 (amending OAR 845-025-7580(1) and requiring all licensees to use CTS for all inventory tracking activities at licensed premises and to record all required information, including the wet weight of marijuana after harvest); *id*. at 94 (amending OAR 845-025-7750 and requiring a licensee to "maintain accurate and comprehensive records regarding waste material that accounts for, reconciles, and evidences all waste activity related to the disposal of marijuana".).

"As entered in the METRC system:

| | |
|---|---|
| Inventory originally claimed as disposed: | 519.04 pounds |
| Inventory available for sale in METRC: | 115.81 pounds |
| Adjusted inventory for sale: | 634.85 pounds |
| Less police seizure: | 107.00 pounds |
| Total inventory for sale: | 527.85 pounds |
| Business average sale price per pound: | $800.00 |
| Estimated FMV of adjusted inventory | $422,277 (527.85 x $800 = $422,280)" |

(Ptf's Decl of Ringo, Ex 6 at 3.)

As the table above shows, the auditor increased the 115.81-pound inventory showing as "available for sale" in METRC, by 519.04 pounds--the amount Byzantium purportedly claimed as "waste" or "destroyed" on its METRC reports, then subtracted 107 pounds that Plaintiff alleged had been seized by police during a raid. (*See id.* at 3-5; *see id.* at 4, ¶ 13 ("police seized a quantity of cannabis from the facility.").) The auditor thus concluded that Byzantium had a total of 527.85 pounds of inventory. When multiplied by $800 per pound, the total inventory value shown in the conference decision is $422,280. Finally, the conference decision implicitly assumes that all of the additional inventory was sold, yielding $422,280 in gross receipts, rather than Plaintiff's reported gross receipts of $52,500. The difference ($369,780, which Defendant apparently reduced to $369,777) is the basis of Defendant's computation of the assessment. (*See id.,* Ex 6 at 2 (referring to "adjustments increasing sales income by $369,777).)

Plaintiff vigorously objects to Defendant's reliance on Byzantium's METRC data, asserting that the conference decision erroneously treats "waste" as "packaged weight" and conflates "dry weight" with "wet weight." (*Id.* at 6, ¶ 20.) Plaintiff also contests the accuracy of the METRC data more generally, stating that the tracking system was viewed by Byzantium "with contempt." (*See* Ptf's Reply & Resp at 8-9 ("[E]veryone who worked at Byzantium's cannabis facility viewed the METRC system with contempt. It was necessary to report plant

information on METRC in order to satisfy the OLCC, but in terms of serving a meaningful purpose, it had none. The Byantium [sic] workers felt little need to accurately report information on METRC. As a result, the METRC data reported by Byzantium's cannabis operation was far from accurate.").)

*Appeal of Magistrate Decision.* Plaintiff timely appealed from a Magistrate Division decision upholding Defendant's assessment for 2018 of additional personal income tax, penalties, and interest totaling $44,766.79. (*See* Am Compl at 2, ¶11; Def's Ans ¶11.)

## III.  ISSUES

A.  Does undisputed evidence putting Plaintiff's credibility at issue create a genuine issue of material fact as to whether Byzantium's gross receipts exceeded the amount reported on its return?

B.  Was Defendant's assessment of additional tax or the Magistrate Division's upholding of the assessment made without procedural safeguards against unlawful exactions of tax, such that issuing or upholding the assessment violated Plaintiff's right to procedural due process under the Fourteenth Amendment of the United States Constitution?

C.  Does Defendant's conduct in determining the amount of the assessment "shock the conscience," in violation of Plaintiff's right to substantive due process under the Fourteenth Amendment of the United States Constitution?

## IV.  ANALYSIS

A.    *Does undisputed evidence putting Plaintiff's credibility at issue create a genuine issue of material fact as to whether Byzantium's gross receipts exceeded the amount reported on its return?*

Plaintiff seeks a "summary determination to vacate Defendant's assessment and an order requiring Defendant to return the funds paid by Plaintiff under that assessment." (Ptf's Mot

Summ J at 1-2.) As to his first legal theory, Plaintiff's premise is that Byzantium had no more gross receipts than the $52,500 reflected on its return for 2018. Defendant contests that premise, arguing that Byzantium had more gross receipts than reported.

Plaintiff relies on his own declaration and attached exhibits. However, the exhibits in no way support Plaintiff's position that Byzantium had only the amount of gross receipts reflected on its return.[8] The sole support in the record for Plaintiff's position that those amounts are Byzantium's *only* gross receipts is found in Plaintiff's own statements in his declaration. Defendant, relying on case law, argues that evidence in the record relating to Plaintiff's credibility raises a genuine issue of material fact as to whether Byzantium had more gross receipts than reported.

The credibility of a declarant is not expressly addressed in the court's summary judgment rule. TCR 47 C, which is nearly identical to Rule 47 of the Oregon Rules of Civil Procedure (ORCP), requires the court to grant Plaintiff's motion "if the pleadings, depositions, affidavits, declarations, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." TCR 47 C. As a test for the existence of a genuine issue of material fact, the rule states:

> "No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment."

*Id.* The rule imposes a burden of production on the non-moving party:

---

[8] The exhibits would be highly problematic even as to whether Byzantium had *at least* the amount of gross receipts shown on its return, were that point at issue here: Exhibits 1 through 4 appear to be bank records showing deposits that add up to the amount of gross receipts Plaintiff attributes to Byzantium, but none of the accounts are in the name of Byzantium; all are in the name of other legal entities. (*See* Ptf's Decl of Ringo, Exs 1-4 (bank statements for "R Bar R LLC," "Epic Coffee, LLC," "Desert Sky LLC," and "Charlie Ringo Attorney at Law PC.").)

ORDER GRANTING DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
TC 5480

"The adverse party has the burden of producing evidence on any issue raised in the motions as to which the adverse party would have the burden of persuasion at trial. The adverse party may satisfy the burden of producing evidence with an affidavit or declaration under section E of this rule."

"* * * * *

"[A]n adverse party may not rest upon the mere allegations or denials of that party's pleading, but the adverse party's response, by affidavits or declarations or as otherwise provided in this section, must set forth specific facts showing that there is a genuine issue as to any material fact for trial."

TCR 47 C-D.  This burden of production on the non-movant is the focus of Plaintiff's argument; he contends that Defendant has failed to produce "specific admissible evidence supporting the Department's calculation of revenue of $422,277."  (Ptf's Reply & Response at 1.)

Defendant argues that it need not do so to defeat summary judgment, citing *Barnett v. Redmond School District 2J*, 209 Or App 724, 734, 149 P3d 250, 256 (2006) and *To v. State Farm Mut. Ins.*, 319 Or 93, 105, 873 P2d 1072 (1994).  In *Barnett*, the Court of Appeals articulated a "principle" that applies "where the moving party offers only witness affidavits in support of its motion and the credibility of the affiants is brought into question by specific facts, particularly when the knowledge of events on which the action lies are exclusively within the control of the party moving for summary judgment."  209 Or App at 733-34 (quoting *Doughty v. Birkholtz*, 156 Or App 89, 99, 964 P2d 1108 (1998) (internal quotation marks and ellipsis omitted)).  In this circumstance, "when the nonmovant can show some specific factor that directly places the affiant's credibility in jeopardy, that showing raises a fact issue sufficient to defeat summary judgment."  209 Or App at 734.  The Court of Appeals "extrapolated" its principle from *dicta* stated by the Oregon Supreme Court in *To v. State Farm Mutual Ins.*, 319 Or 93, 104, 873 P2d 1072 (1994) ("If the nonmoving party produces specific facts related to the affiant's credibility, then summary judgment may be inappropriate * * *.").

This court adopts the principle first stated in *To* and later applied in *Barnett.  See* ORS 305.425(3) (Tax Court's rules of practice and procedure * * * shall conform, as far as practical to the rules of equity practice and procedure in this state"); TCR Preface ("To the extent that the wording of a TCR is the same as that of an ORCP, cases interpreting the ORCP may be looked to as authority for interpreting the TCR.").  Because Plaintiff relies on his own statements as evidence that Byzantium's gross receipts were limited to the amounts reported on its return, Defendant may seek to defeat Plaintiff's motion with evidence that raises an issue as to Plaintiff's credibility.  By allowing Defendant to do so, the court necessarily rejects Plaintiff's position that the only way Defendant can create a genuine issue of material fact is to produce evidence affirmatively supporting the amount of gross receipts reflected in the assessment.[9]

---

[9] Specifically, this ruling makes it unnecessary to address Plaintiff's allegations that Defendant failed to put forward evidence that its assessment methodology was "reasonable."  (Ptf's Mot Summ J at 13; *see also* Def's Resp at 9 ("When a taxpayer fails to maintain required records of gross receipts, the department not only may but must use reasonable methods to reconstruct that income.").)  Any issue of compliance with audit standards is for trial.

The court notes that, apart from the requirement of "good faith" in ORS 305.265(2), the statute does not expressly prescribe a standard for an audit methodology; nor does this court's decision in *Brenner v. Dept. of Rev.*, 9 OTR 299 (1983), limit Defendant to a particular set of methodologies.  ORS 305.265(2) provides:

"If the department discovers from an examination or an audit of a report or return or otherwise that a deficiency exists, it shall compute the tax and give notice to the person filing the return of the deficiency and of the department's intention to assess the deficiency, plus interest and any appropriate penalty.  Except as provided in subsection (3) of this section, the notice shall:

"(a) State the reason for each adjustment;

"(b) Give a reference to the statute, regulation or department ruling upon which the adjustment is based; and

"(c) Be certified by the department that the adjustments are made in good faith and not for the purpose of extending the period of assessment."

*Cf.* ORS 305.265(10)(a) ("*In the case of a failure to file a report or return* on the date prescribed therefor (determined with regard to any extension for filing), the department shall *determine the tax according to the best of its information and belief*, assess the tax plus appropriate penalty and interest * * *.") (Emphasis added).  In *Brenner*, this court refers with approval to certain "'indirect audit techniques'" to reconstruct income if books and records are unavailable for any reason, or are obviously incomplete or inaccurate.  9 OTR at 302 n 2.  However, the decision later states:  "'It is unquestionably correct to say that the existence of unreported income may be demonstrated by any practicable proof that is available in the circumstances of the particular situation.'"  *Id.* at 306 (quoting 2 Mertens, *Law of Federal Income Taxation,* § 12.12).

The court now applies this principle to the record. The court focuses on two related and undisputed facts: (1) Plaintiff's acknowledgment of OLCC violations that include "intentional misrepresentation[s]," an instance of intentional destruction of evidence, and numerous failures to disclose facts or to properly account for inventory, and (2) Byzantium's violation of the requirement under federal tax law to keep records needed to establish income and deductions.

The court finds the acts constituting the OLCC violations highly relevant to Plaintiff's declaration about Byzantium's gross receipts, because those acts occurred during or shortly before the tax year at issue, at a time when Plaintiff managed Byzantium's operations and owned 85 percent of its shares, and they overwhelmingly involve the amount, classification, and tracking of inventory that could have given rise to gross receipts. (*See* Def's Decl of Rieder, Ex B.) The court also finds the nature of the acts highly relevant to credibility. Violations Two, Three, and Six are findings of intentional misrepresentations. (*See id.* at 1-2.) Violations Four and Five concern a failure to disclose and the destruction or concealment of evidence. (*See id*. at 2.) Several others involve failures to "fully and transparently" account for reportable activities. (*Id.* at 1-3.) Taken together, the OLCC violations were sufficiently serious to cause the OLCC to cancel Byzantium's producer license. (*See id.* at 4.) The court concludes that the conduct Plaintiff acknowledges in this agreement, standing alone, easily suffices as a "specific factor that directly places [Plaintiff's] credibility in jeopardy." 209 Or App at 734.

Likewise, Plaintiff's violations of federal tax records law are highly relevant to the credibility of the statements in his declaration. The federal income tax is a "system of self-assessment" that requires each taxpayer to file a return truthfully disclosing the computation of that taxpayer's tax. Bittker & Lokken, *Federal Taxation of Income, Estates, and Gifts* ¶ 111.1.1 (rev Mar 2026). This requirement of honest reporting is coupled with a duty to substantiate, as

the same laws that impose the return obligation also require taxpayers to "keep such records" (IRC § 6001) as are "sufficient to establish the amount of gross income" and other items needed for the tax return (Treas Reg § 1.6001-1(a)). Thus, in the context of net income taxes, a total failure to keep records substantiating a key item, such as gross income from sales, will also undermine a taxpayer's credibility. Here, the court finds that Plaintiff's testimony to date is jeopardized by his acknowledgment that he "kept track of 2018 sales by handwriting on a single piece of paper," but "destroyed that piece of paper because [he] feared a raid by law enforcement." (Ptf's Decl of Ringo at 7.)

The court concludes that the existence, or not, of gross receipts in excess of $52,500 must be determined at trial. A genuine issue of material fact exists as to that issue because the record shows that the only evidence that *no* such excess gross receipts exist consists of Plaintiff's sworn statements. The court does not here determine Plaintiff's credibility as to those statements, but the court does determine that Defendant has put forward sufficient evidence to call Plaintiff's credibility as to those statements into question.[10] At trial, the court will assess the credibility of all witnesses, including Plaintiff if he testifies.

///

///

---

[10] The court notes, but sees no need to consider, the remaining list of facts that Defendant asserts put Plaintiff's credibility at issue:

> "The court reasonably may infer that Mr. Ringo lied to his banking institution about the nature of his business: "Cash received by Byzantium for cannabis sales in 2018 was deposited in the Wells Fargo Bank account titled Epic Coffee[.]" Ringo Decl. ¶ 1. Mr. Ringo admits that his business sold marijuana unlawfully in 2018. Ringo Decl. ¶ 11. He admits that his 'chief grower' was involved in an illegal attempt to manufacture butane honey oil--a process that ended in an explosion and serious injury. Ringo Decl. ¶ 12. When police searched the grow facility in response to the explosion, they seized cannabis and documented multiple violations of regulations. Ringo Decl. ¶ 13.1 * * * Mr. Ringo claims that he was the victim of 'substantial theft' but never reported the theft to police. Ringo Decl. ¶ 27."

(Def's Resp & XMot Part Summ J at 6-7; *see also id.* at 12-14.)

B.      *Was Defendant's assessment of additional tax or the Magistrate Division's upholding of the assessment made without procedural safeguards against unlawful exactions of tax, such that issuing or upholding the assessment violated Plaintiff's right to procedural due process under the Fourteenth Amendment of the United States Constitution?*

Plaintiff asserts that his motion is based in part on a failure of procedural due process, but he does not argue the point.[11]  (*See* Def's Resp and XMot Part Summ J at 14.)  *See* US Const, Am XIV.[12]  In a tax case, procedural due process requires a state to "provide procedural safeguards against unlawful exactions."  *McKesson Corp. v. Division of Alc. Bev.*, 496 US 18, 36, 110 S Ct 2238, 110 LEd 2d 17 (1990)).  The fundamental requirement is to provide a "meaningful opportunity" to secure at least postpayment relief.  *Id.* at 22. The uncontested evidence shows that, following his audit, Plaintiff and his counsel exercised a right to appear before a conference officer; the conference officer conducted research with the OLCC regarding Byzantium's reports of inventory; the conference officer also heard various oral statements by Plaintiff in response to the auditor's findings and the conference officer's research; the conference officer and Plaintiff agreed that Plaintiff would have "two weeks to prepare a more

---

[11] Neither Plaintiff's Amended Complaint nor his motion distinguishes between procedural and substantive due process. (*See* Am Compl at 4, ¶ 22; Ptf's Mot Summ J at 15-16.) Defendant points this out. (*See* Def's Resp & XMot Part Summ J at 14.) On reply, Plaintiff insists that he "has asserted a violation of both procedural and substantive due process," but he chooses to "focus on the violation of his substantive due process." (Ptf's Reply and Resp at 5.) The court concludes that Plaintiff has waived all legal argument as to procedural due process.

[12] Plaintiff alleges violations of the "Fifth and Fourteenth Amendments to the United States Constitution." (Ptf's Am Compl at 4, ¶ 22; *see* Ptf's Mot Summ J at 15-16.) The Fifth Amendment provides: "No person * * * shall be deprived of life, liberty, or property, without due process of law * * *." US Const, Amend V. The Fourteenth Amendment provides: "No State shall * * * deprive any person of life, liberty, or property, without due process of law * * *." US Const, Amend XIV. The procedural due process components of the two Amendments are "the same." *Propert v. District of Columbia*, 948 F2d 1327, 1330 n 5 (DC Cir 1991). However, due process claims against states generally are adjudicated under the Fourteenth Amendment, not the Fifth Amendment. *See, e.g., Obergefell v. Hodges,* 576 US 644, 663, 135 S Ct 2584, 192 L Ed 2d 609 (2015) (referring, in majority opinion, solely to Fourteenth Amendment); *DeShaney v. Winnebago County Dept. of Social Services*, 489 US 189, 195-96, 109 S Ct 998, 103 L Ed 2d 249 (1989) (applying Fourteenth Amendment against state agency; discussing Fifth Amendment as "counterpart" to Fourteenth Amendment); *but see Obergefell*, 576 US at 725 (dissent) (concluding that Fifth Amendment Due Process Clause likely defines reach of Fourteenth Amendment Due Process Clause); *see generally* Ronald D. Rotunda & John E. Nowak, *Rotunda and Nowak's Treatise on Constitutional Law*, § 15.6(a) (rev Sept 2025) (discussing theory of "incorporation" of rights against the states through Fourteenth Amendment).

complete, detailed and clarifying appeal in writing"; Plaintiff did not respond within the agreed deadline; and thereafter the conference officer wrote about the audit findings and Plaintiff's oral statements in a six-page single-spaced conference decision. (Ptf's Decl of Ringo, Ex 6 at 5.) After receiving the conference decision and notice of assessment, Plaintiff received a two-day trial in the Magistrate Division, where he testified, submitted exhibits, and ultimately received a 14-page decision. (*See* Am Compl, Ex 1 at 1 ("Charles A. Ringo (Plaintiff) appeared and testified on his own behalf. * * * Plaintiff's Exhibits 1 to 31, 34 to 38, 40 to 66, 68 to 71 (except pages 8 to 11), 76, 77 and 79 were received into evidence.") On this record, the court concludes that no reasonable juror could return a verdict for Plaintiff on the fairness of the proceedings, and that Defendant, not Plaintiff, is therefore entitled to prevail as a matter of law. The court will deny Plaintiff's motion and grant Defendant's cross-motion with respect to Plaintiff's unargued assertion of a procedural due process violation.

C.      *Does Defendant's conduct in determining the amount of the assessment "shock the conscience," in violation of Plaintiff's right to substantive due process under the Fourteenth Amendment of the United States Constitution?*

Plaintiff argues that his *substantive* due process rights were violated because (1) the methodology used by Defendant's auditor, based on data Byzantium had reported to the OLCC, was "deeply flawed," yet Defendant's conference officer knowingly upholds that methodology in the conference decision and the assessment; and (2) a second, square footage-based, methodology used in the conference decision is speculative and rests on "no evidence whatsoever." (Ptf's Mot Summ J at 2-3.)[13] Defendant's cross-motion argues that its

---

[13] Plaintiff also at times argues that the assessment is invalid because it violates federal case law prohibiting the Internal Revenue Service from issuing a "naked assessment." (Ptf's Mot Summ J at 15 (citing *Portillo v. Commissioner*, 932 F2d 1128 (5th Cir 1991).) Plaintiff nowhere argues that that case law has been incorporated into Oregon law. *Cf. Allison v. Dept. of Rev.*, 11 OTR 431 (1990) (holding that authority delegated under Internal Revenue Code section 482 to Secretary of Treasury to reallocate income and deductions among legal entities or other persons does not apply to Defendant unless a state statute says so) ("No provision gives defendant the

methodologies easily satisfy the "highly deferential standard" for substantive due process, because they are not so "arbitrary" as to "shock the conscience." (Def's XMot Part Summ J at 17-18, 21.)

The court largely agrees with Defendant's statement of the test. In this case, involving executive, not legislative, action, the assessment will withstand substantive due process scrutiny if it is not the result of "deliberate indifference" or similarly arbitrary conduct that, in the circumstances, "shocks the conscience." *Lewis*, 523 US at 845-51 (depending on the "circumstances," government conduct within a "middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence," may shock the conscience, thereby violating substantive due process rights) (internal quotations omitted); *see also Thunderbird Mobile Club, LLC v. City of Wilsonville*, 234 Or App 457, 480-81, 228 P3d 650 (2010) (applying *Lewis*).[14]

The court now applies this test to the two methodologies Plaintiff criticizes, concluding that no reasonable juror could find that the assessment is so arbitrary as to shock the conscience. As to Defendant's first methodology, based on Byzantium's OLCC data, Plaintiff criticizes:

1. Defendant's assumption that Byzantium entered correct CTS data on its reports;

2. Defendant's assumption that all of the cannabis Byzantium marked as destroyed was instead sold illegally;

---

administrative authority delegated to the Secretary of the Treasury."); *cf. Steinmeyer v. Commonwealth*, No. 617 FR 2010, 2013 WL 3946349, at *2 (Pa. Commw. Ct. Jan. 17, 2013) ("We note that Steinmeyer has not cited any Pennsylvania state court case adopting the Federal rule on naked assessments and this Court has found no such case. In addition, the cases cited by Steinmeyer as articulating the naked assessment doctrine do not cite the United States Constitution as authority for the doctrine (although there would appear to be due process concerns if an assessment were without any foundation whatsoever)."). This court does not treat Plaintiff's "naked assessment" arguments as an issue separate from the substantive due process issue.

[14] "Executive action," for purposes of substantive due process analysis, refers to "a specific act of a governmental officer." *Id.* at 846. The challenged conduct here is executive action: Plaintiff attributes the assessment to the conduct of individual employees of Defendant specific to Plaintiff's tax return.

3. Defendant's assumption that all of the cannabis Byzantium marked as "packaged weight" was sold; and

4. Defendant's "double counting" of 314 pounds of cannabis as both "waste" and "total packaged weight" (Plaintiff contends that the marijuana should have been counted only once, as packaged weight).

(Statement of Charles Ringo, Oral Argument, Jun 30, 2025, at 10:13-10:15; *see* Ptf's Mot Summ J at 9-10.)

Even assuming for purposes of the cross-motions that Defendant's assumptions and computations were erroneous in the ways Plaintiff contends, the court concludes that the methodology based on Byzantium's OLCC data does not shock the conscience. In evaluating Plaintiff's argument, the court looks to the circumstances of the case. *Lewis*, 523 US at 850 ("Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."). Key circumstances include the following uncontested facts:

- This case involves a self-assessed tax; as discussed above, this means that Plaintiff is required by federal law to keep the relevant data supporting the components of taxable income reported, and Defendant is allowed to request and use those data in an audit.

- Apart from third-party data consisting of inconclusive bank records and Byzantium's reports to the OLCC, Plaintiff destroyed the only record ever kept.

- Inventory information Byzantium reported to the OLCC included:

  o Intentional misrepresentations that cannabis plants had been destroyed, when in fact they had been retained. (*See* Def's Decl of Rieder, Ex B at 1 (Violation Number Two); *id.* at 2 (Violation Number Three).)

  o Accounting failures, including "approximately 268 unaccounted-for packages of cannabis seeds" not present on the date reported (Violation Number Seven); marijuana parts reported as present but not present (Violation Number Eight); marijuana parts found on the premises without identification in the CTS (Violation Numbers Nine through Eleven). (*See id.* at 2-3.)

- Plaintiff met with Defendant's conference officer before the conference decision was issued; Plaintiff presented oral factual representations and arguments about Defendant's methodology based on Byzantium's OLCC data, and he proffered an alternative methodology to calculate gross receipts. (*See* Ptf's Decl of Ringo, Ex 6 at 4 (Plaintiff presented concerns about use of "wet" weight, proposed eliminating one grow room's worth of capacity, proposed reducing salable product attributable to police seizure).) Plaintiff agreed to provide a written explanation, with written substantiation materials and a copy of the medical marijuana program card and police raid report, but Plaintiff failed to do so. (*See id.* at 5.)

In these circumstances, the court finds it unsurprising that an assessment methodology based on the OLCC data may contain a significant level of potential error. Whether it does, and to what extent, are matters to be determined at trial, as part of the court's overall effort to establish the correct amount of any deficiency. But the record clearly establishes that Defendant's methodology, based on data that Byzantium submitted to the OLCC and without the benefit of follow-up data promised by Plaintiff, comes nowhere close to shocking the conscience. The conference decision states:

> "Based on the violations the OLCC found regarding useable marijuana that was listed as destroyed but were, in fact, not destroyed, the auditor essentially used the number of pounds you listed as 'waste' in the CTS as a measure of unreported income. The methodology wasn't intended to be precise, because it was already recognized by everyone, including you, that the numbers in the CTS are unreliable."

(Ptf's Decl of Ringo, Ex 6 at 6.) This summary statement indicates that Defendant concluded from the OLCC settlement agreement that some amount of inventory had gone unreported; that Defendant sought to identify that amount; and that Defendant selected a number from Byzantium's OLCC data as a proxy. While Defendant concedes that the number is not precise, the use of that number does not shock the conscience because it is based on Plaintiff's data; furthermore, Plaintiff agreed, but failed, to provide a timely written explanation of his arguments about use of the OLCC data, along with additional written substantiation.

Plaintiff also criticizes Defendant's second methodology, which is based on an industry survey of the average yield of 39.5 grams per square foot of greenhouse space among greenhouse growers of cannabis. (*See id.* at 6 (citing *Measuring Yield*, Cannabis Business Times (Oct 16, 2016), *available at* https://www.cannabisbusinesstimes.com/home/article/15699459/measuring-yield.) Using square footage of 30 x 90 feet for each of Byzantium's two greenhouses (which Plaintiff does not dispute), Defendant determined a potential yield of 870 pounds. (*See id.*) This greatly exceeds the total inventory for sale that Defendant estimated using only the OLCC data (527.85 pounds). (*See id.* at 3.) Plaintiff disputes this result as having "no connection to reality" for two reasons. (Ptf's Mot Summ J at 7.) As to the possibility that cannabis might have been grown in the greenhouses during 2018, Plaintiff argues that "[i]n central Oregon it is impossible to grow cannabis in greenhouses in the winter." (Ptf's Reply & Resp at 7 (citing Ptf's 2nd Decl of Ringo at 1).) Plaintiff's assertion may be substantiated by Plaintiff's flyer advertising Byzantium's facility for sale. (*See* Def's Decl of Rieder, Ex E at 2 ("We don't grow in the greenhouses in the winter!").) However, Plaintiff acknowledges that "there might have been some inventory from cannabis grown in the greenhouses in the summer of 2017," and the sole evidence of its potential amount is his own unsubstantiated declaration. (*See* Ptf's 2nd Decl of Ringo at 1 ("Any cannabis grown in the Byzantium greenhouses during the summer of 2017 would not have generated significant revenue, if any, in 2018.").)

For substantive due process purposes, the court finds it important that Defendant did not change the assessment based on this second, square footage-based methodology; rather, Defendant apparently used it solely to test the validity of its computation methods under the first methodology. Therefore, the court need not determine whether the particular way Defendant applied the square footage-based methodology, apparently with limited effort to gather data,

shocks the conscience on a standalone basis. The court concludes only that Defendant's limited use of the square footage-based methodology as a check on the assessment does not shock the conscience.

## V.  ORDERS

Now, therefore,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment is denied.

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Partial Summary Judgment as to due process issues is granted.

Dated this 23rd day of April, 2026.

4/23/2026 2:41:53 PM

Judge Robert T. Manicke